The American Rapid Telegraph Company, Appellant, *v.* Jacob Hess et al., Respondents.

The legislature, in the exercise of its police powers, may regulate the use of the streets of a city, and may prohibit their use for any purpose inconsistent with general street purposes; it may also authorize their use for public purposes not inconsistent with their use as streets.

Of this power of control over streets for public purposes the legislature cannot divest itself, and it has no other authority over them.

*It seems* that the General Telegraph Act (Chap. 265, Laws of 1848, as amended by chap. 471, Laws of 1853), does not grant to a corporation organized thereunder any interest in the streets of a city; at most it simply confers an authority or license to enter upon such streets for its purposes subject to certain conditions.

By said act the legislature, in effect, determines that the erection of poles and stringing of wires for the business of telegraph is a public use not inconsistent with the use of the streets for general street purposes; and said act having been passed in the exercise of the police power of the state, was not beyond the reach of future legislation; the license so granted, although acted upon, may be revoked or modified by the legislature at any time when the public interest demands it.

Assuming, however, that said act does, in some sense, grant interest in the city streets to corporations organized under it, and that the state thereby contracts *sub modo* with such corporations, yet the corporations in the exercise of the rights granted are under legislative control.

The acts providing for placing electrical conductors under ground in the cities of the state (Chap. 534, Laws of 1884; chap. 499, Laws of 1885, chap. 716, Laws of 1887), are constitutional; they do not annul, destroy or materially impair any franchises or contract rights previously secured under the General Telegraph Act, but simply regulate and control the exercise, so that they shall cease to constitute a public nuisance.

*It seems* that if the authority to so regulate and control the use of public streets for electrical conductors does not otherwise exist, it will be found in the provision of the General Telegraph Act (§ 5), which declares that telegraph lines shall not be "so constructed as to incommode the public use of highways."

The provisions of the United States statutes authorizing the construction and maintenance by telegraph companies of their lines over and along any of its military or post-roads, and making all letter-carrier routes in cities post-roads (U. S. R. S. §§ 3964–5263, 5668, Act passed March 1, 1884), confer no rights upon such corporations which can operate to divest the state of control over its public highways, or to interfere with their use as such.

Plaintiff, a corporation organized under the General Telegraph Act, had, prior to 1883, erected its poles and strung its wires in the streets of the city of New York. Subways for electrical conductors having been constructed in certain of the streets, under and in accordance with the provisions of said acts providing therefor, notice was given to plaintiff, as prescribed, requiring it to remove its poles and wires from said streets and place its electrical conductors in the subways. Having refused to comply with the notice, the commissioner of public works caused the poles to be cut down and the wires removed. *Held*, that an action was not maintainable to restrain such interference; that plaintiff had no right after notice to longer maintain its poles and wires above the surface of the streets; and that they became a nuisance which the public officials had the right to remove.

(Argued February 4, 1891; decided February 24, 1891.)

APPEAL from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order made December 29, 1890, which affirmed a judgment of the Special Term, dismissing plaintiff's complaint upon the merits.

The facts, so far as material, are stated in the opinion.

*William G. Wilson* for appellant. The right to take or destroy property without making compensation, is based upon the maxim *publica salus summa lex.* It is justified only by immediate and urgent necessity, and continues only so long as the pressing necessity continues. (*A. P. Works v. Lawrence*, 23 N. J. L. 624; *In re Jacobs*, 98 N. Y. 107; Mills on Em. Domain, § 7.) In any scheme for the benefit of the general welfare of the community in its health, its convenience, its safety, its enjoyment of life and liberty, involving as an incident or as essential to its accomplishment the appropriation or destruction of private property, the right to take or destroy such property must be exercised through the right or power of eminent domain. (*Baker v. Boston*, 12 Pick. 193.) The police power, is, so far as it affects property, the right of the state to prescribe and regulate the use of property so that the public at large or other individuals shall not be injured by its use. (*Commonwealth v. Alger*, 7 Cush. 85.) Plaintiff's lines were built in conformity with the laws of the state. They are taxed as real

estate, and they are real estate just as much as are houses, lands, railroads and other properties recognized as real, and cannot be destroyed without compensation made therefor. (*A. U. T. Co.* v. *Middleton,* 80 N. Y. 428; *N. Y., O. & W. R. Co.* v. *W. U. T. Co.,* 36 Hun, 205; *E. T. Co.* v. *Salford,* 1 Jur. [N. S.] 733; Laws of 1881, chap. 597; 2 R. S. [7th ed.] 1625.) Defendants' claim that the lines of the plaintiff should be treated as nuisances is untenable. (Laws of 1848, chap. 265, § 5; Laws of 1853, chap. 471, § 2; *Millet* v. *Mayor, etc.,* 13 Blatchf. 469; *People* v. *M. T. Co.,* 11 Abb. [N. C.] 304; *Davis* v. *Mayor, etc.,* 14 N. Y. 506; *Easton* v. *N. Y. & L. B. R. R. Co.,* 24 N. J. 49.) The state cannot pass any act impairing the obligations of its contract with the plaintiff. (*People* v. *O'Brien,* 111 N. Y. 45.) The regulations which the laws of the United States establish are controlling, for the protection as well as the control of the plaintiff's lines. (U. S. R. S. §§ 5263, 5268, 5269; *P. T. Co.* v. *W. U. T. Co.,* 96 U. S. 1; *Leloup* v. *Port of Mobile,* 127 id. 645; *R. R. Co.* v. *Husen,* 95 id. 473; *Henderson* v. *Mayor, etc.,* 92 id. 271; *N. O. G. Co.,* v. *L. L. Co.,* 115 id. 672.) There is no force in the objection that this suit should have been brought in the name of the receiver of the American Rapid Telegraph Company. (*Harland* v. *B. & M. T. Co.,* 32 Fed. Rep. 307.)

*D. J. Dean* for respondents. The statute creating the board of electrical control and defining its powers, and authorizing the removal of telegraph lines from the public streets, are constitutional and valid. (Laws of 1884, chap. 534; Laws of 1885, chap 499; Laws of 1887, chap. 716; *Kidd* v. *Pearson,* 128 U. S. 1; *People* v. *Squires,* 108 N. Y. 593; *Commonwealth* v. *Alger,* 7 Cush. 84; *Sharp* v. *R. & B. R. R. Co.,* 27 Vt. 149; *People* v. *Morris,* 113 Wend. 325; *Wynehamer* v. *People,* 13 N. Y. 421; *U. S. I. Co.* v. *Hess,* 19 N. Y. S. R. 883; *U. S. I. Co.* v. *Grant,* 27 id. 767.) The removal of the dead wires which were unused, and which, remaining in the streets, became the source of danger, was justified by the

law which authorized the removal of unlawful obstructions and incumbrances from the streets by the superintendent of incumbrances, under the direction of the commissioner of public works. (Laws of 1882, chap. 410, § 317, subd. 8; 27 N. Y. S. R. 778; Laws of 1887, chap. 716, § 4.) No judgment can be rendered in this action in favor of the plaintiff until the receiver shall have been made a party thereto. (Code Civ. Pro. §§ 446, 452.)

Earl, J. Prior to 1883, the plaintiff was incorporated under the act 265 of the Laws of 1848, the general act for the incorporation and regulation of telegraph companies, and the acts amendatory thereof, and prior to that year it had erected its lines of telegraph poles and wires in the streets of the city of New York, described in the complaint. It also had extensive connecting lines in other states and throughout this state which constituted a system of telegraphy then in active use and operation.

Section 5 of the act of 1848 provides as follows: " Such association is authorized to construct lines of telegraph along and upon any of the public roads and highways, or across any of the waters within the limits of this state, by the erection of the necessary fixtures, including posts, piers or abutments, for sustaining the cords or wires of such lines ; provided the same shall not be so constructed as to incommode the public use of said road or highways or injuriously interrupt the navigation of said waters ; nor shall this act be so construed as to authorize the construction of any bridge across any of the waters of this state."

The act chapter 471 of the Laws of 1853 amends the act of 1848, and section 2 thereof provides as follows: " Such association is authorized to erect and construct, from time to time, the necessary fixtures for such lines of telegraph upon, over or under any of the public roads, streets and highways, and through, across or under any of the waters within the limits of this state, subject to the restrictions in the said recited act contained."

The plaintiff constructed its telegraph lines in the streets of the city of New York, under the acts referred to, without any special grant or authority from the city.

The claim of the plaintiff is that these acts operated as a grant to it of a franchise to use the streets for its poles and wires, and that, therefore, an inviolable contract was created which is under the protection of the Federal Constitution, and hence that neither the state nor the city under its authority could cause its poles and wires to be removed from the streets, except upon compensation to it ascertained in the manner prescribed by the Constitution and laws for cases where private property is condemned for public use.

We think the act of 1848, as amended in 1853, can in no proper sense be said to have granted any interests to the plaintiff in the streets of the city. There certainly was no formal grant, and the statutes contain no terms or phraseology appropriate to a grant. They at most confer upon the plaintiff an authority or license to enter upon the streets for its purposes, and subject to certain conditions. The people of the state do not own the streets, and the only authority the legislature has over them is to deal with them as streets, and to regulate their use as streets for public purposes; and by these acts it in effect determined that one of the purposes for which the streets could be used, was the erection of poles and stringing of wires for the business of telegraphing, and that that was a public use not inconsistent with the use of the streets for general street purposes. These were general, public legislative acts in the exercise of the police power of the state, and, therefore, they were not beyond the reach or touch of future legislation. The legislature did not intend to divest itself and could not divest itself of its control over the streets for the public welfare, and we must infer, from the language used, that it did not intend to bind itself by an irrevocable grant. If, therefore, these acts are to be construed as merely conferring a license which has been acted upon by the plaintiff, the legislature could revoke the license or modify it in any way or at any time when the public interest might require it.

But in this case it is not necessary to hold that the plaintiff did not, by the acts referred to, obtain some sort of franchise in the streets of the city. We may, for the present purpose, construe these acts as constituting, in some sense, grants of interests in the streets to the companies organized under them, and contracts *sub modo* with such corporations, and yet the contention of the plaintiff in this case most fail.

In the exercise of its rights under the assumed grant and contract, this corporation was subject to the regulation and control of the legislature. By giving the franchise the state did not abdicate its power over the public streets, nor in any way curtail its police power to be exercised for the general welfare of the people, nor did the state absolve itself from its primary duty to maintain the streets and highways of the state in a safe and proper condition for public travel and other necessary street and higway purposes. The grant, if any, was made in reference to the streets and their maintenance and regulation forever as streets. The state could at all times regulate the size and location of the poles, the height of the wires from the surface of the ground and their location in the streets; and when the poles and wires became a serious obtruction and nuisance in the streets from any cause, it could take such action and make such provisions by law as were needful to remove the nuisance and restore the utility of the streets for public purposes. The right of the plaintiff to maintain and operate its wires in the streets could certainly be no greater then the right of railroads which by public authority occupy the streets and highways of the state. The state in the exercise of its police power, and the regulating control which it has over corporations created by its authority, may exercise a general supervision over such corporations. It may prescribe the location of the tracks, the size and character of the rails, the precautions which shall be taken for the protection of the public, and the character and style of highway crossings; and no one has ever questioned that it may do whatever is necessary and proper for the public welfare in the control and regulation of the franchises which such corporations have obtained by statutory authority.

Now what has the legislature attempted to do in this case? By the act, chapter 534 of the Laws of 1884, it was provided that all telegraph, telephone and electric light wires and cables in all cities of the state having a population of five hundred thousand or over, "shall hereafter be placed under the surface of the streets, lanes and avenues" of the city, and that it should be accomplished before the 1st day of November, 1885. It was further provided that in case the owners of the property specified should fail to comply with the act within the time specified the local governments of the cities should remove, without delay, all such wires, cables and poles whenever found in their respective cities. Under that act no property was or could be taken from any of the owners specified. They were simply required to remove their poles and wires from the surface of the streets and place the wires underground. Their property was not taken, but the use of their franchise was regulated. In 1885 chapter 499 was enacted, which provided for the appointment of a board of commissioners of electrical subways, and that board was charged with the duty of enforcing the provisions of the act of 1884. It was made the duty of that board to cause to be removed from the surface of the streets and put and maintained underground, whenever practicable, all electrical wires and cables, so as to enable and require all duly authorized companies operating the same to transact their business with underground conductors whenever practicable. All subways for underground conductors of electricity were required to be built under the direction and control of that board, and no electrical wires or cables were to be allowed above the surface of the streets without the permission of the board. Commissioners were duly appointed under that act, and in 1886 the Consolidated Telegraph and Electrical Subway Company of New York having been incorporated under the laws of this state, the commissioners entered into a contract with it, whereby it contracted to build, with its own capital, the necessary subways for the electrical conductors, the subways to be constructed in all respects subject to the approval of the

commissioners. It was also provided in the contract that all corporations owning and operating electrical wires above the streets should have the right to place them in the subways under certain conditions specified. In 1887 the legislature enacted chapter 716, entitled "An act in relation to electrical conductors in the city of New York." By that act the agreement made between the subway commissioners and the Consolidated Telegraph and Electrical Subway Company above referred to was ratified and confirmed, and the act provided that whenever, in the opinion of the board of electrical control constituted by that act, sufficient conduits or subways underground shall have been made ready the board shall notify the owners or operators of the electrical conductors above ground in such streets or locality to make such electrical connections in such underground conduits or subways as shall be determined by the board, and to remove their poles and wires from the street within ninety days after such notice. This provision was made a police regulation in and for the city of New York, and in case it was not complied with by the telegraph and other companies referred to it was made the duty of the commissioner of public works to cause the poles, wires, etc., to be removed forthwith by the bureau of encumbrances upon the written order of the mayor to that effect.

Subways having been constructed in certain of the streets of the city of New York, by the Consolidated Telegraph and Electrical Subway Company, under the supervision and with the approval of the board of electrical control, notice was given to the plaintiff as provided in the act to remove its poles and wires from the streets, and place its electrical conductors in such subways. Having refused to comply with such notice and with the provisions of the act, the commissioner of public works of the city caused the poles to be cut down and the wires to be removed from the streets.; and this is what the plaintiff complains of.

Its property was not taken for public use; it was simply removed from the streets where it had become a nuisance, and the public authorities had the same right to remove it from

the streets, doing no unnecessary damage, that it had to remove any other encumbrance therefrom. After the passage of the acts referred to and the building of the subways and the notice to the plaintiff, it had no right longer to maintain its poles and wires above the surface of the streets. They were then there without authority and thus became a nuisance, and hence the public officials had the right to remove them. It is quite true that the plaintiff could not remove its electrical conductors into the subways without some expense. But the same is true of railroads occupying streets; they cannot change from one style of rail to another, nor from one place in the street to another, nor make a change of grade without a considerable expense; and yet the mere fact that they are subjected to expense is no answer to the right of the public, in pursuance of law, to require them to comply with the prescribed regulations.

If the authority did not otherwise exist to require these poles and wires to be removed from the streets it could be found in section 5 of the act of 1848, in which is contained the authority to construct telegraphic lines upon public roads and highways, with the proviso that the same shall not be "so constructed as to incommode the public use of such roads or highways." Who shall judge whether they incommode the public use of the streets? It is unquestioned that they do, and the legislature has determined that fact, and when the plaintiff maintained its wires and poles in the streets in such a manner as to incommode the public use of the streets, the legislature had the right to provide that they should put them under the streets, so that the streets above the surface could be devoted to the public uses for which they were intended.

The plaintiff seeks to strengthen its position in reference to the use of the streets of the city of New York, under the laws of the United States, to which we will make brief reference. It is provided in section 5263 of the Revised Statutes of the United States that "Any telegraph company now organized, or which may hereafter be organized under the laws of any state, shall have the right to construct, maintain and oper-

ate lines of telegraph through and over any portion of the public domain of the United States, over and along any of the military or post-roads of the United States which have been, or may hereafter be declared such by law, and over, under, or across navigable streams or waters of the United States; but such lines of telegraph shall be so constructed and maintained as not to obstruct the navigation of such streams and waters, or interfere with the ordinary travel on such military or post-roads." Section 5268 provides that "Before any telegraph company shall exercise any of the powers or privileges conferred by law such company shall file their written acceptance with the postmaster-general of the restrictions and obligations required by law." Section 3964 provides that all letter-carrier routes established in any city or town for the collection and delivery of mail matters are post-roads; and by the act approved March 1, 1884, it is enacted that "all public roads and highways, while kept up and maintained as such are hereby declared to be post-routes." The plaintiff filed the written acceptance with the postmaster-general required by section 5268.

The precise scope and range of operation of these sections within a state are not quite apparent, and cannot be easily defined. But this much, at least, must be true, that under them no telegraph company could interfere with the use of the streets and highways of the state, except under regulations prescribed for the control of all telegraph companies within the state, nor could such companies interfere with streets and highways in the state so as materially to impair their usefulness as ordinary highways. Nor could these congressional acts deprive the state of its control over its highways and its right to regulate their use under the police power for the public welfare. The laws of congress are perfectly satisfied by the permission granted to the plaintiff, of which it is perfectly feasible for it to avail itself to place its electrical conductors in the subways constructed beneath the surface of the streets.

We have carefully scrutinized the contract entered into by the board of electrical control with the defendants, the Consolidated Telegraph and Electrical Subway Company, and we

find nothing in its provisions unreasonable or impractical, and the power of the legislature to authorize such a contract and to confirm it when made, is beyond doubt. These acts of 1884, 1885 and 1887, have been under consideration in several cases and have uniformly been upheld and enforced. (*People ex rel.* v. *Squire,* 107 N. Y. 593 ; 1 N. Y. S. R. 633 ; *United States Illuminating Co.* v. *Hess,* 19 id. 883 ; *United States Illuminating Co.* v. *Grant,* 27 id. 767 ; *Western Union Tel. Co.* v, *Mayor,* etc., Opinion by WALLACE, J., in U. S. Circuit Ct.)

We are, therefore, of opinion that the judgment should be affirmed, with costs.

All concur.

Judgment affirmed.