THE PEOPLE ex rel. THE WESTERN UNION TELEGRAPH COM-
PANY, Appellant, *v.* EDWARD DOLAN et al., Assessors, etc.,
Respondents.

THE SAME, Appellant, *v.* MICHAEL A. TIERNEY et al., Assessors,
etc., Respondents.

THE SAME, Appellant, *v.* MICHAEL A. TIERNEY et al., Assessors,
etc., Respondents.

A person whose property is assessable and has been assessed in a town,
who fails to appear before the board of assessors on "grievance day" is
guilty of *laches* that will warrant a refusal to grant him any relief in a
subsequent application to reduce such assessment.

The act of 1881 (Chap. 597, Laws of 1881), "fixing the manner of assessing
certain real estate of telegraph companies," was superceded by the act of
1886 (Chap. 659, Laws of 1886), providing for the assessment of telegraph
and other companies named.

The latter act is to be construed in connection with the act of 1881 (Chap.
361, Laws of 1881), providing for taxing telegraph and other companies
for state purposes.

Under the provisions in said act of 1886 providing that the portion of a
telegraph line in any town or ward shall be assessed "in the manner
provided by law for the assessment of lands of resident owners" (§ 1),
and that the word "lines" shall include "the interest in the lands on
which the poles stand, the right or license to erect such poles, all poles,
arms, insulators, wires, instruments or other things connected with or
used as part of each line" (§ 2), the property specified is to be assessed
"at its full and true value" (1 R. S. 392, § 17).

It is not to be regarded as part of a whole or as a complete telegraph line
in operation, and its value for telegraph purposes, its position, con-
nections and productive capacity may not properly be taken into consid-
deration, as these considerations enter into the question of the value of
the business and franchises of the company, provision for the taxation
of which is otherwise made (Chap. 361, Laws of 1881).

The measure of the value of the "poles, arms, insulators, apparatus, instru-
ments and wires," as they are capable of indefinite reproduction at a
known cost, is this cost, including the requisite expenditure for labor to
set them up ready for use, and when the value is thus shown by uncon-
tradicted evidence it must be taken.

In arriving at the value of the interest in the land on which the poles stand
and of the right or license to erect such poles, it is to be considered that so
far as the line is erected upon a highway the only interest the telegraph
company has is a mere license revocable at the pleasure of the legislature,

of which license any other similar company may avail itself.   The cost which the company incurred in obtaining the interest is the correct criterion by which to judge of its value.

*It seems* that where poles are placed on the land of an individual the price paid or the amount of any liability incurred therefor will be good evidence of the value of the right.

The distinction between such a case and that of the assessment for taxation of the property of a railroad or bridge company pointed out.

As for the purposes of an appeal, a judgment in proceedings by certiorari to review an assessment under the act of 1880 (Chap. 269, Laws of 1880) is to be considered as an order, and as an appeal is provided for by said act, the fact that the judgment does not involve $500 does not affect its appealability.

*People ex rel.* v. *Tierney* (57 Hun, 357), reversed in part.

(Argued March 9, 1891; decided April 14, 1891.)

Appeal from judgments of the General Term of the Supreme Court in the third judicial department, entered upon orders made the first Tuesday of May, 1890, which affirmed orders entered upon decision of Special Term quashing writs of certiorari, in proceedings to review assessments upon the relator's property in the city of Troy for the years 1885, 1886 and 1887.

The facts, so far as material, are stated in the opinion

*Wager Swayne* and *Edwin A. King* for appellant.   For the purpose of appeal the determination of the lower court in proceedings by certiorari to review an assessment under chapter 269, Laws of 1880, although in form a judgment, is to be considered as a final order.   (Code Civ. Pro. § 191 ; Laws of 1880, chap. 269 ; *People ex rel.* v. *Keator*, 101 N. Y. 610 ; *People ex rel.* v. *Hicks*, 105 id. 198 ; *People ex rel.* v. *Haupt*, 104 id. 377.)   An appearance before the board of assessors upon grievance day is not necessary to the jurisdiction of the court to allow the writ in proceedings under Laws of 1880, chapter 269.   (*People* v. *W. S. Bank*, 39 Hun, 529 ; *People ex rel.* v. *Comrs.*, 99 N. Y. 254 ; *People ex rel.* v. *Gray*, 45 id. 243 ; *People* v. *Becker*, 54 Hun, 1 ; *People ex rel.* v. *Lavis*, 55 id. 521.)   The statements provided to be filed by the general law

(1 R. S. 414, § 2), as well as those required by laws of 1881, chapter 597, are not necessary to the jurisdiction of the court to issue the writ of certiorari under Laws of 1880, chapter 269. The failure to file such statement in nowise affects the basis of valuation, nor impairs the right of the relator to review the assessment by certiorari. (1 R. S. [8th ed.] 414, 415, 1149, 1150; *People ex rel.* v. *Comrs.*, 76 N. Y. 75; *People ex rel.* v. *Cheetham*, 46 Hun, 6.) The court below erred in failing to hold that the property of the relator was assessed for the purpose of taxation for the year 1885 at an erroneous and unequal valuation. (Laws of 1881, chaps. 364, 597; *People ex rel.* v. *Comrs.*, 76 N. Y. 75; *Hartwell* v. *Root*, 19 Johns. 345; *Leland* v. *Cameron*, 31 N. Y. 122; *Lawson* v. *Pinckney*, 8 J. & S. 198; *People ex rel.* v. *Christie*, 115 N. Y. 158; *Perry* v. *Dickerson*, 85 id. 345; *Smith* v. *Smith*, 79 id. 634; *Rice* v. *King*, 7 Johns. 20; *Haskins* v. *Mayor, etc.*, 11 Hun, 436; *McWilliams* v. *Morrill*, 23 Hun, 162.) In 1885, 1886 and 1887 the assessments were illegal and void, because not in compliance with 1 Revised Statutes, chapter 13, title 2, section 6. (*Whitney* v. *Thomas*, 23 N. Y. 285; *Cruger* v. *Dougherty*, 43 id. 107; *Brevoort* v. *City of Brooklyn*, 89 id. 134; *Westfall* v. *Preston*, 49 id. 355; Laws of 1880, chap. 332, § 1.) The oaths of the assessors annexed to the assessment-roll in each of the respective years were severally defective and rendered the assessments illegal and void. (*Thompson* v. *Burhans*, 61 N. Y. 63; *Cook* v. *Staats*, 18 Barb. 407; *Hopkins* v. *Mason*, 61 id. 473; *Lane* v. *Morse*, 6 How. Pr. 394; *People* v. *DeCamp*, 12 Hun, 378; *Bank* v. *Elmira*, 53 N. Y. 59; *Craft* v. *Merrill*, 14 id. 459, 460; *Stanton* v. *Ellis*, 16 Barb. 324; *People* v. *Jones*, 43 Hun, 133; Laws of 1884, chap. 83; Laws of 1880, chap. 332, § 1; *Brevoort* v. *City of Brooklyn*, 89 N. Y. 128.)

*William J. Roche* for respondents. The objection made at the outset in this case, as well as in two other proceedings found in the appeal book, that an appeal does not lie from the judgment or determination of the General Term to this court,

because the amount involved is not $500, is untenable.    (Code
Civ. Pro. § 191, subd. 3; *Nichols* v. *Voorhis*, 74 N. Y. 28;
*Petrie* v. *Adams*, 71 id. 79; *Wheeler* v. *Schofield*, 67 id. 311;.
*Rogers* v. *Village of Sandy Hill*, 94 id. 638; *People ex rel.* v.
*Keator*, 101 id. 610.)    There was no unequal or overvaluation
of relator's property in either of the three cases.    The presump-
tion is that the valuation of the property as listed on the assess-
ment-rolls for the purposes of taxation by sworn public officers,
is correct, and such valuation must stand until shown to be
erroneous by affirmative proof in behalf of the corporation.
*(People ex rel.* v. *Davenport*, 91 N. Y. 574; *People ex rel.*
v. *Barker*, 48 id. 70, 77; *People ex rel.* v. *Hicks*, 40 Hun,
598; *People ex rel.* v. *Comrs. of Taxes*, 76 N. Y. 75; *People
ex rel.* v. *Pond*, 13 Abb. [N. C.] 1; *People ex rel.* v. *Kea-
tor*, 19 id. 369; Laws of 1881, chap. 293.)    The assessors
were not concluded on the question of value by the written
statement filed by the relator with the county treasurer for the
year 1885, purporting to be in pursuance of the provisions of
chapter 597 of the Laws of 1881.    (*Smith* v. *Smith*, 79 N. Y.
634; *Haskin* v. *Mayor, etc.*, 11 Hun, 436; *Mc Williams* v.
*Morrill*, 23 id. 162; *Perry* v. *Dickerson*, 85 N. Y. 345;
*Palmer* v. *Hussey*, 87 id. 303; 3 Abb. Dig. 452; *Brown* v.
*Mayor, etc.*, 66 N. Y. 390; *Newton* v. *Hook*, 48 id. 676; *Gales*
v. *Preston*, 41 id. 113; *Lahr* v. *M. E. R. Co..* 104 id. 287.)
No application was made by the relator nor by any person in
its behalf to the assessors before the completion of the assess-
ment-rolls for the year 1885, for a reduction of the valuation
of its property on said rolls.    The writ of certiorari will not
lie under chapter 269, Laws of 1880, unless the party applying
for it has first applied to the board of assessors during its ses-
sion to hear grievances as provided by the statute.    (*People* v.
*Turner*, 117 N. Y. 238; *People* v. *M. T. Co.*, 99 id. 254;
*People* v. *W. S. Bank*, 39 Hun, 529; *People ex rel.* v. *Hicks*,
40 id. 598; *People ex rel.* v. *Chatham*, 45 id. 7, 8; *People ex
rel.* v. *Osterhoudt*, 24 Wkly. Dig. 101.)    The omission by the
relator to comply with the provisions of 2 Revised Statutes
(7th ed.), 1036, is a fatal objection to the granting of any

**170**    People ex rel. W. U. T. Co. *v.* Dolan et al.  [April,

Opinion of the Court, per Peckham, J.

relief. (*People ex rel.* v. *Comrs. of Taxes*, 31 Hun, 568; 99 N. Y. 254.) No fraud or bias being alleged, the judgment of the chosen officers of the law, under oath for this purpose, shall not be disturbed without showing palpable error in such valuation, and injury arising therefrom to the relator. (*People ex rel.* v. *McCarthy*, 102 N. Y. 642, 643.) The verification needed no venue. (*Coleman* v. *Shattuck*, 62 N. Y. 348.) The objections that the verification was had before a commissioner of deeds of the city of Troy, and not before "any officer of their county authorized by law to administer oaths," or before "an officer of the county of Rensselaer," as required by the special act (Chap. 1, Laws of 1886); also the objection that the assessments have been made in districts and not in wards, are untenable. (Laws of 1848, chap. 12, art. 5, § 2; *King* v. *City of Buffalo*. 32 N. Y. S. R. 264; *Reiter* v. *Reid*, 33 id. 591; *Ingersoll* v. *Bostwick*, 22 N. Y. 425; *Briggs* v. *Waldron*, 83 id. 582; *People ex rel.* v. *Hicks*, 40 Hun, 604.) The relator cannot claim that so far as the assessment for 1886 is concerned, the assessors were to be governed by any statements purporting to be made in pursuance of the provisions of chapter 597 of the Laws of 1881. (Laws of 1886, chap. 569; *People* v. *G. & S. Co.*, 98 N. Y. 77.) This case is unlike the proceeding for 1885, in that the relator did appear before the assessors and object to the assessment. It was shown on the trial that on one of the "grievance" days in August, 1886, Harvey J. King, as counsel for the relator, appeared before the assessors, and left with them two affidavits, which were produced in evidence, but are not printed in the case. Those affidavits simply stated that relator's property in the city of Troy did not exceed in value $4,000, and which were made on information and belief. Those affidavits were not conclusive against the assessors. (*People* v. *Fredericks*, 48 Barb. 173; *People ex rel.* v. *McCarthy*, 102 N. Y. 642.)

Peckham, J. We have lately held in *People ex rel. West Shore Railroad Company* v. *Adams, Trustee, etc.* (125 N. Y. 471), that a person, under the circumstances in which this

relator stood, failing to appear before the board of assessors. on what is known as grievance day, is guilty of such *laches* as to warrant the court in refusing to grant him any relief in the premises.

It sufficiently appears in this proceeding that the relator did thus fail in the years 1885 and 1887.

This leaves only the assessment of 1886 open for inspection and review.

In the affidavit made on the part of the relator to procure the certiorari to review the assessment for that year, it is alleged that the assessment is erroneous and illegal by reason of over-valuation and is unequal because made at a higher proportionate valuation than other real property on the roll. It is also alleged that the actual value of the property of the relator within the limits of the city of Troy, and all fixtures connected therewith, does not exceed $4,000. . The writ of certiorari was duly issued and the defendants made return thereto, and the issues were referred to a referee to take testimony, after which the matter came on for a hearing before the court at Special Term, which made various findings of fact and upon the merits quashed the writ. Upon appeal to the General Term, that court affirmed the order of the Special Term, and from the affirmance the relator has appealed here. The court at Special Term found the value of the taxable property of the defendant and listed on the assessment-roll of Troy for the year 1886 to be at least $12,000.

If there be any evidence to support the finding this court is concluded. But, if it appear that, in coming to that conclusion, the courts below have included improper and illegal elements as a basis for valuation, then an error of law has been made which is reviewable here.

Upon the hearing before the referee to take testimony, the counsel for the defendants, under the objection of the relator's counsel, proved that the annual receipts of the relator's Troy office were about $30,000. At another time before the court, the counsel for the defendants objected to proof as to the cost of setting the ordinary-sized pole in Troy, because as counsel said,

the property of the company was real estate and must be valued as a whole. He also objected to evidence of the cost of freight in transporting relator's poles to Troy, because it was not competent to reduce the value of the real estate in such manner. He made the same objection to proof of the wages of employes engaged in setting the poles.

The eleventh finding of fact by the court is that "except as appears from the assessment-rolls in said city, for the year 1886, there is no sufficient proof of the actual value of the relator's telegraph property, as it was then established and in operation in the city of Troy as part of an extensive system for transmitting information and news by telegraph."

In his opinion at Special Term, the learned judge said: "In ascertaining the value of the real estate in question, it must be regarded as a part of a whole of a complete telegraph line in operation. Its value, not as poles and wires simply, but for telegraph purposes, and its position with its connections and its productive capacity are important if not controling considerations." At the General Term in the opinion delivered, the learned judge says upon this point: "The cost of construction was by no means controling as to the value of the relator's property in Troy. That was only an integral part of a great system which extended over the entire state, and by itself might be of little value as compared with its value as a part of the entire system." And in his brief before this court, the learned counsel for the defendants, in justifying the valuation placed upon the relator's property by the assessors and by the court at Special Term, uses this language : " In ascertaining the actual value of such property, the assessors had the right and it was their duty to look beyond the cost of specific material at wholesale prices, and the cost of the labor, and to estimate such property not as an isolated piece of land, but in connection with its position, its incidents and the business and profits to be derived therefrom."

It is thus seen that it has been assumed as a fact by the courts below, and it is conceded by counsel, that the defendants pursued the method above mentioned of determining the

value of the property of the relator in the city of Troy for purposes of local taxation. The question now to be decided is whether this method or system is valid.

For the purpose of fixing the manner of assessing what the legislature denominated " certain real estate of telegraph companies," it passed, in the year 1881, an act (Chap. 597 of the Laws of that year), by which it was provided that telegraph companies in the state should, on a certain day in each year, make a sworn statement showing the total length of their lines in each county, with the cost of construction and equipment thereof, and the assessors within each county were to assess for purposes of taxation such proportion of the cost of construction as the length of the lines in the district of the assessors bore to the total length of the lines in the county.

The legislature at the same session passed the act (Chap. 361), taxing the corporations therein named in the manner stated. Among such corporations are telegraph companies. The tax is declared to be one upon the corporate franchise or business of the corporation, is payable annually, and is computed upon the par value of the capital stock, the percentage of tax depending upon the amount of dividends paid by the company, or if no dividends or a less amount than six per cent is paid, then the tax is to be at the rate named in the statute upon a certain valuation of the capital stock. In addition to this tax, and by the same act, the companies named therein are to pay to the state treasurer, as a further tax on their corporate franchises or business in the state, a certain tax upon the gross earnings in the state for the business therein. These two acts of the legislature should be construed together as *in pari materia*, and in them is provided a system for the taxation of the property of telegraph companies, their franchises and business (exclusive of real estate in the ordinary acceptation of that term which might be owned by them). This system continued until 1886, when the legislature passed the act providing for the assessment of telegraph, telephone and electric light lines, and known as chapter 659 of the Laws of that year. This act should also be construed in connection

with the act of 1881, chap. 361. The important sections are 1 and 2, and they read as follows:

Section 1. The portion of any telegraph, telephone or electric light line in any town or ward in this state shall be assessed in such town or ward to the owner, or person, or corporation, or association in control thereof, in the manner provided by law for the assessment of lands of resident owners, and the same proceedings may be had upon such assessment, and for the collection of any tax levied thereon.

§ 2. The word "lines" shall include the interest in the land on which the poles stand, the right or license to erect such poles on land, all poles, arms, insulators, wires and apparatus, instruments or other thing connected with or used as a part of such line in such town or ward, and belonging either to the owner of such line or the person, corporation or association in control thereof.

This act superseded that of 1881, chapter 597.

Of course the land, that is a house and lot or a vacant lot of ground, owned by a telegraph company is assessed to it in the same way it would be to any other owner. The act of 1886 does not allude to real estate or land strictly so-called. It refers to the telegraph "line" in the town or ward, and it is to be assessed in the manner provided by law for the assessment of lands of resident owners.

It being thus necessary to assess the lines as land in the manner provided by law for the assessment of lands of resident owners, and the statute providing that the word "lines" must include, among other items of value, the interest in the land on which the poles stand and the right or license to erect such poles on land, it becomes necessary to inquire what is the manner provided by law for the assessment of the lands of resident owners. The Revised Statutes provide the manner. (1 R. S. 389, tit. 2, art. 1.) The resident is to be assessed in the town or ward of his residence when the assessment is made for the lands owned by him within such town or ward, and the full value of such land is to be set down by the assessors in a separate column in their assessment-roll. The assessors

are to estimate and assess the land at its full and true value as they would appraise the same in payment of a just debt due from a solvent debtor. This is the manner provided by law for the assessment of lands of a resident owner.

What is the full and true value of this property of a telegraph company, and how is it to be arrived at? To enact that certain things shall be regarded as and included in the term "land" or "real estate," does not in the least alter the essential nature or characteristics of the things which are to be thus called. To say that the word "land," when used in the law with reference to taxation, shall include not only the land itself, but all telegraph lines, wires, poles, arms, insulators, apparatus and instruments, does not change their essential nature. They remain articles which are manufactured, and which can be duplicated and supplied to any required extent at a certain known cost of production. The company may be able to procure the instruments, poles or wires at a less cost than others, owing to their special advantages, but anyone can procure such articles in all the quantities desired. The supply has always kept pace with the demand. The value of the poles, arms, insulators, apparatus, instruments and wires would, therefore, consist of the cost of production, meaning by that term to include the value of the labor necessary to set them up and place them ready for use. If any of these articles were patented, and the company did not own the patent, the price paid therefor would be their value where they could be furnished indefinitely as desired. To call these things land does not make them land in their nature. As they are capable of indefinite reproduction at a known cost, that cost must, in the nature of the subject, be their value for the purpose of the statute. And when that cost is shown by evidence which is uncontradicted and in no way doubtful, or in fact doubted, then such cost must be deemed the value of those separate articles. But this is not all that shall be taxed under the provisions of the statute.

The interest in the land on which the poles stand and the right or license to erect such poles on land, are also to be

included in the assessment of the property of the company.. What is the nature of the interest in the land on which the poles stand? We have held in *American Rapid Telegraph Co.* v. *Hess* (125 N. Y. 641), that a telegraph company, organized under the act of 1848, and obtaining from it the right to construct its lines of telegraph upon the public streets or highways, acquired no absolute interest in the highway or the land, and that it was subject to the police power of the state, wielded through its municipal agencies, which could direct the lines to be taken down and placed in subways provided for them.

This interest in the land in a street is in reality nothing more than a license granted by the state. In the language of the act, it is an authority to construct lines along and upon the public roads and highways. This license may also be revoked by legislative enactment. It was so stated in the case heretofore cited (*American Rapid Tel. Co.* v. *Hess*), and we feel strengthened in our views in that case by further reflection. Therefore, the value of the interest in the land in which a pole is placed in a public street by a telegraph company must be arrived at in consideration of the important fact that such interest is a mere license and revocable at the pleasure of the legislature. It must also be observed that any other telegraph company organized under the general law may avail itself of the same license to enter upon the public streets. So there is really no title whatever in the company to the land thus used, and its only interest is subject to extinguishment by the legislature at any time. The cost which the company incurred in obtaining the interest in the land in a public street would in this case, taking into consideration all the acts providing for the taxation of the company, be a correct criterion by which to judge of its value. As to the value of the right or license to erect the poles on land, also spoken of in the act, much the same reasoning is to be adopted. This right or license is one which any company may avail itself of if incorporated under the general act, and it costs nothing.

If the company, in placing its poles on the land of any individual, shall have paid anything to the owner of the land for

such use, or incurred any contractual liability to him, the amount paid, or the amount included in such liability, would be good evidence of the value of the right. There might be other elements entering into that question, but in this case all the poles seem to have been placed exclusively in the public streets. If the company should pay an abutting owner on a public street or highway for the use of the interest, or any part of it, which the owner may have in such street or highway, such payment would be part of the cost of obtaining the interest in the land and the right to therein erect the poles. Taking the cost of the production of those articles, which are in their nature personal property and capable of infinite production, as above described, and adding to that cost the value of the interest in the land on which the poles stand and the value of the right to erect such poles on the land, upon the principles above indicated, and we have the total elements entering into the full and true value of the property of the company subject to taxation under the act of 1886 above cited. In the assessment for taxation under that act, the property is not to be regarded as a part of a whole, nor as a complete telegraph line in operation. Its value for telegraph purposes, and its position with its connections, and its productive capacity, are not considerations entering into the value of the property under the act last named. These considerations are foreign to its purpose. They largely enter into the question of the value of the business and the franchises of the company, and the value of such business and franchises is to be assessed under the act of 1881, already quoted. If it were not for that act and its provisions for assessing the value of the business and franchises of telegraph companies for the purpose of taxation, it may be that courts would strive to give a wider meaning, if possible, to the language of the act of 1886, for the purpose of reaching these subjects of taxation. But when they are already taxed under a separate act, it cannot be supposed that the legislature intended to tax them again proportionately in every tax locality in the state.

It is obvious that the learned courts below, in arriving at their conclusions as to the proper facts to consider in deciding the question of the value of the property of the relator, viewed it as if such property were real estate in the narrow acceptation of the term, such as a piece of ground on which a house was erected or rails laid, and which was owned by the relator in fee. The authorities cited in support of their proposition relate to railroads or bridges forming part of real estate owned in fee by the companies. In such cases it is held that in determining the value of such real estate, its earning capacity is a most important feature, and that in assessing the real estate of a railroad it is to be assessed not as an isolated piece of property, but in connection with its position, its incidents and the business and profits to be derived therefrom; its productive capacity and its earnings are all to be considered, and the cost of the whole road is to be taken into account. (*People ex rel.* v. *Barker*, 48 N. Y. 77; *People* v. *Hicks*, 40 Hun, 600; *People ex rel.* v. *Weaver*, 34 id. 322.)

In this case under the statute of 1886, as to telegraph companies, different language is used and a different kind of property is intended to be reached for assessment. The poles, wires instruments, arms, insulators and apparatus are included in the word "lines" in the statute, and they are to be assessed in the manner provided by law for assessing the lands of residents. The statute points out how that it is to be done, and the property is to be assessed at its full value, together with the interest in the land on which the poles stand and the right to erect such poles on the land. This interest and this right differ wholly in character and nature from the real estate owned in fee by the railroad or bridge company, and the rules for the valuation of that species of property are by no means appropriate for the purpose of arriving at the full value of the property of the telegraph company as enumerated in the statute of 1886. Most of this property it is seen is personal property and it is called land, although the poles are placed in streets which do not belong to the company and in which the company has as we have seen no interest of a strictly legal nature. The

railroad or bridge company on the contrary does own the fee of the real estate upon which it places its superstructure of rails or bridge, and the question arises what is the value of this real estate owned by the company upon which this superstructure has been placed and which is used for railroad or bridge purposes. · That question involves almost necessarily the inquiry as to the profitableness of the superstructure which has been placed thereon and which forms part and parcel of the real estate upon which it is laid, and this can only be answered by regarding the real estate as part of a whole portion of real estate devoted to the railroad or bridge purpose. The land, the portion of the earth on which the rails rest, is owned by the company, and the company to that extent has a monopoly. This land cannot be increased or reproduced. The structure having been placed on it becomes a part of it, and it must all be appraised at its full value as an integral part of a whole or completed instrument created for the purpose of realizing pecuniary profit. The cost of each particular portion of real estate, while one element to be considered for the purpose of determining the question of profits, cannot in the nature of the property be regarded as the one important consideration for the purpose of arriving at its full value for taxation.

Without continuing the comparison it seems to me there is a clear, radical and important difference in the very nature of the properties to be taxed, and which should lead to a different rule in the assessment of what is in fact real estate or earth in the one case, and personal property in the other, although called land.

A question as to the appealability of this order as not involving five hundred dollars, has been made by counsel for defendants. The counsel calls it a judgment of the General Term. It is in truth an order, and it has been so held to be by us. (*People ex rel., etc.*, v. *Keator*, 101 N. Y. 610.) We think the appeal is provided for by the act which gives the remedy by certiorari, and hence the point made by counsel for the defendants is not well taken.

The orders of the General and Special Terms so far as they

relate to the assessment of 1886, should be reversed and that assessment should be set aside, with directions to the assessors to reassess the property of the corporation for the year 1886, in conformity with the principles laid down in this opinion, and the orders of the General Term so far as they relate to the assessments of 1885 and 1887, should be affirmed. . No costs to either party on any appeal.

All concur.

Ordered accordingly.