(29 Misc. Rep. 48.)

ELECTRIC POWER CO. v. MAYOR, ETC., OF CITY OF NEW YORK et al.

(Supreme Court, Special Term, New York County. September, 1899.)

1. MUNICIPAL CORPORATIONS—PERMIT TO ELECTRIC POWER COMPANY—CONSTRUCTION.

Laws 1884, c. 534, provides that all telegraph, telephone, and electric light wires and cables used in any incorporated city of the state of over 500,000 inhabitants shall be placed under ground. Laws 1885, c. 499, authorizes the appointment of three commissioners to enforce the act of 1884, and provides that such commissioners shall devise a general plan for a subway system, and that in the suburbs or sparsely-inhabited portions of the city, where it is impracticable to operate underground, the board shall grant an application to deviate from an underground system. Laws 1887, c. 716, relating to electrical conductors in the city of New York, designates the board of commissioners of electrical subways as the "board of electrical control," and by section 3 provides that when, in any street or locality, a sufficient construction of subways underground shall be made ready, the board shall notify the owners above ground to make connections with the subways, and to remove those wires above ground, within 90 days after notice, and, if the owners shall not do so, it shall be the duty of the commissioners of public works to cause the same to be removed forthwith. On October 19, 1888, the board of electrical control

passed a resolution authorizing plaintiff to construct suitable wires or other electrical conductors in, on, over, and under the streets, avenues, and public parks in New York for distributing electricity, subject to existing rules and future regulations, with a proviso that consent was given on the express condition that, until further order of the board, the electrical conductors of plaintiff should be laid, and the privileges exercised only, in and through the subways constructed by a certain company, under the act of 1887, under the supervision of the board, to be leased to plaintiff by said company referred to. Plaintiff constructed its electrical system over the housetops and streets. After due notice had been given to plaintiff to remove certain of its wires, the commissioner of public works cut them down, and the same were sold, and the proceeds received by the city. *Held*, that the proviso in the resolution passed by the board of electrical control was not void, as being repugnant to the general grant of permission to use overhead wires, and hence the commissioner of public works was justified in cutting the wires.

2. SAME—UNAUTHORIZED USE RIPENING INTO FRANCHISE.

Any inadequacy of the subways at the time notice was given to remove the surface wires did not ripen the use by plaintiff of overhead wires, which was founded on the limited consent given by the electrical board of control, into an absolute right or franchise.

3. SAME—CONVERSION OF WIRES BY CITY.

The city, having appropriated and sold the wires which it cut, is guilty of conversion, and liable to plaintiff for their value.

Action by the Electric Power Company against the mayor, aldermen, and commonalty of the city of New York and others for an injunction and damages. Judgment for plaintiff.

Roger Foster, for plaintiff.

John Whalen, Corp. Counsel (Theodore Connoly and Terence Farley, of counsel), for defendants.

RUSSELL, J. The complaint seeks relief by way of injunction compelling the restoration of the plaintiff's electric wires and appurtenances, maintained aerially until removed by defendants, and $250,000 damages for the unlawful acts alleged to have been done by the defendants through which the plaintiff's electric service in the city of New York was destroyed. The action was begun in October, 1889, and a preliminary injunction obtained at the commencement of the action restraining the interference with the plaintiff's wires, which remained in force till July 2, 1891, when it was dissolved. It is claimed that subsequently to the dissolution of the injunction the defendants cut down and appropriated a large amount of the wires laid upon the housetops and across the streets in the city of New York, thus destroying the plaintiff's electrical system and business. The issue arises upon the amended and supplemental complaint, which, by stipulation, was served in March, 1896, and by common consent of the counsel the action is now practically reduced to a question as to whether the defendant shall pay the damages occasioned by the destruction of the plaintiff's property, franchise, and good will. The plaintiff claims that it derived the right to maintain its electric wires and appurtenances in the city of New York over the housetops and across the streets by a resolution of the board of electrical control, October 19, 1888, and the consent of the owners of the dwellings.

As serious difference exists between the parties as to the meaning and force of the resolution giving consent to the construction and operation of the plaintiff's lines, it is proper to consider the situation of the statutory law in respect to the subject, existing at the time of the consent, in aid of the construction of the contract itself. O'Brien v. City of New York, 139 N. Y. 543, 35 N. E. 323. It is also proper to consider the circumstances existing, and the character of the material force to be used, in aid of the construction of the statute itself. Id. The presence of overhung wires in the thickly-settled streets of the city of New York had become the occasion of danger and disturbance. The slightest carelessness of subordinates in the construction of or attention to electrical lines led to imperfect insulation, by which forcible currents of electricity would be turned into any material substance which would act as a conductor, and thus become harmful to life and property through possible fire. The presence of overhead electric wires with those telegraphic and telephonic, or even without them, prevented the proper use of fire ladders and hose, so necessary for immediate use in the sudden emergencies of fires, besides being the occasion of danger to the firemen themselves, whose minds would be fully occupied with their immediate duty, and who might not be mindful of the proximity of electric currents. It was therefore deemed essential to protect personal property against this subtle and powerful fluid in the thickly-settled regions of the city of New York, while at the same time due encouragement should be given to the quasi public service to be performed through the agencies of electric appliances furnishing light and power.

In the year 1884 the legislature enacted by chapter 534 that all telegraph, telephone, and electric light wires and cables used in any incorporated city of the state of over 500,000 inhabitants should thereafter be placed under the surface of the streets, lanes, and avenues of the city. The date was fixed of November 1, 1885, as the period when the wires and cables should be removed from the surface of the streets and avenues. The local governments of the cities were directed to remove, after that date, all such wires found aboveground. This act was within the undoubted power of the legislature, even as to companies which had erected their aerial fixtures and lines before the passage of the act, because it was within the police power of regulation, and the business done by the companies was one which was affected by the public interest. It was not within the power of the legislature to surrender such right of regulation, and no grant of franchise could be created by it which was beyond recall. People v. Budd, 117 N. Y. 1, 22 N. E. 670, 682, affirmed in 143 U. S. 517, 12 Sup. Ct. 468; People v. Squire, 107 N. Y. 593, 14 N. E. 820, affirmed in 145 U. S. 175, 12 Sup. Ct. 880. The consent given under the subsequent acts of 1885 and 1887 is proper so far only as the use given is consistent with street purposes. Such consent may be given, but it is revocable, and under control, and has no more effect than a license; nor can the legislature devest itself of the power to restrain its use. Telegraph Co. v. Hess, 125 N. Y. 641, 26 N. E. 919. The act

of 1884 was evidently found not to be sufficiently specific in detail, and another act was passed, being chapter 499 of the Laws of 1885, by which the mayor, comptroller, and commissioner of public works might appoint three commissioners of electrical subways, who should enforce the act of 1884. Such commissioners should devise a general plan for a subway system, and should carefully investigate all methods for lighting or communication by conductors carrying electricity along or across any street, avenue, or highway, and should not approve any such method before requiring the lines to be underground so far as practicable. In the suburbs, or sparsely-inhabited portions, or other locality deemed for that purpose proper by the board, where it was impracticable to construct and operate underground, it should be the duty of the board to grant the application to deviate from an underground system, if satisfied upon investigation that such a permit should be granted; but only in the places designated, and even then, as soon as practicable, the electrical conductors should be placed underground, it being declared to be the intent of the act that other than underground electrical conductors should not be used where the public interest required them placed underground; and all aerial electrical connections should be deemed incidental only to underground conductors. The construction of the conductors authorized should be subject to the rules and regulations of the local authorities. Section 4. In 1887, by chapter 716, the legislature passed an act in relation to electrical conductors in the city of New York, designating the board of commissioners of electrical subways as the "board of electrical control." By section 3 it was provided that when, in the opinion of the board, in any street or locality, a sufficient construction of conduits or subways underground should be made ready, reference being had to the direction and vicinity of electrical conductors then in use overhead, the board should notify the owners or operators aboveground to make such electrical connections with the underground conduits or subways, and to remove those wires or other electrical conductors above the ground within 90 days after notice. In case the owners of poles or fixtures or owners or operators of wires should not cause them to be removed as required, the duty was imposed upon the commissioner of public works to cause the same to be removed forthwith by the bureau of incumbrances, by written order of the mayor of the city. With the law existing substantially as stated, on the 15th day of October, 1888, the plaintiff applied for a consent to construct wires and conductors, with the necessary poles, pipes, and fixtures, in, on, or over and under the streets, avenues, public parks and places in the city of New York, to distribute electricity, under such reasonable regulations as the board might provide. On the 19th of October the board of electrical control passed a resolution authorizing and empowering the plaintiff to lay, erect, and construct suitable wires or other conductors, with the necessary poles, pipes, or other fixtures, in, on, over, and under the streets, avenues, and public parks and places of the city of New York for conducting and distributing electricity, subject to all

existing rules and future regulations, with a proviso that consent was given upon the express condition that, until the further order or resolution of the board, the electrical conductors of the company should be laid, erected, or constructed, and the privileges granted exercised only, in and through the subways constructed by the Consolidated Telegraph & Electric Subway Company, under and in pursuance of the provisions of the act of 1887, under the supervision of the board, to be leased to the company by the Consolidated Company referred to. A compensation of 1 cent per lineal foot of street occupied by the conductors was provided for in the resolution. It is claimed by the plaintiff that under this consent it incurred great expense in constructing its electrical system over the housetops and streets, so that its whole electrical system in the city of New York was worth, in November, 1891, at least a quarter of a million of dollars. On the 12th day of October, 1889, in compliance with a resolution of the board of electrical control, the plaintiff was served with a written notice by the commissioner to proceed to remove all electric light wires which were not properly insulated, and were in a· position in violation of the rules and regulations of the board of electrical control, and was required to shut off the electric current from electric light wires. Thereupon the plaintiff brought this action.

On the 31st of March, 1891, notice having been given to the plaintiff more than 90 days before to remove the wires in the streets mentioned in the notice, the board of electrical control passed a resolution requesting the mayor to order by the commissioner of public works the removal of all housetop wires, there being subways for their accommodation, and the 90-days notice in respect to such wires and subways having expired. The commissioner of public works was thereupon directed by the mayor, on the 1st of April, 1891, to remove the housetop wires in the streets named, and notice was also given to the plaintiff of a resolution of the board of electrical control, adopted the 31st of March, 1891, instructing the secretary to notify the plaintiff that in case any of its housetop wires remained up without permit on the 15th of April then next, the board would take action, and have them cut down. In May or June, 1891, the fire department cut down some 6,000 feet of the wire on account of a fire then raging, and in November, 1891, the commissioner of public works, in pursuance of the direction received by him, cut down some 30,600 feet more, which wire was taken to the bureau of incumbrance yard, called the "corporation yard," where articles unclaimed were, by provisions of law, sold, and the city received the proceeds of sale. Prior to this time various complaints had been received by the city of defective wiring, and parts of the plaintiff's wire were defectively insulated, but the evidence does not show to what extent. The evidence is somewhat conflicting as to there being sufficient room in the subways constructed for wires of the size of those used by the plaintiff; but the evidence does not show any diligent effort on the part of the plaintiff at any time to provide for the removal of its wires into the subways. It is a fact, however, that the subways con-

structed up to November, 1891, were insufficient to accommodate all of the wires which had been placed therein and also the wires of the plaintiff, assuming that the plaintiff had the privilege of using the size it did; and in some of the streets in which the plaintiff's wires were strung there were no subways at all. The evidence is not clear as to the times and periods when the subways were filled with the wires of other companies, or how far the plaintiff might, with diligence, have been among the first served. I infer from the evidence that the lines upon the streets which had no subways in them would have been useless with the cutting of the main lines on the streets where the subways existed, on account of the loss of means to continue the electric current from the power station.

The main question, therefore, in this case comes back to the character of the permit granted in October, 1888. The plaintiff claims it to be a franchise to maintain overhead wires, and that the proviso limiting the commencement of such right of construction and maintenance to the time when the board of electrical control should further resolve, and until then such right should be exercised only in and through the subways constructed by the Consolidated Telegraph & Electrical Subway Company under the Laws of 1887, is a limitation repugnant to the grant of a permission to use overhead wires, and so inefficient and void, or that the limitation applies only to except from the grant the right of the plaintiff to construct subways of its own. The case, however, was tried substantially upon the theory that, until suitable and sufficient subways were constructed by the subway company, the plaintiff's right to maintain its wires was perfect under the consent given in October, 1888. In judging of the effect of the resolution under which the plaintiff claims its right, and without which it could not operate, we must take into consideration the situation and the reasons for the change from overhead to underground stringing of wires for the passage of the electric current. Beneath the ground those wires were comparatively harmless; above the surface they might be dangerous, and were quite certain to interfere with the practical working of the fire department. The declared public policy, as announced by the legislature, was, at the time of the passage of the resolution giving consent, to have all such wires and cables placed beneath the surface of the earth. By the terms of the acts of 1884, 1885, and 1887 local authorities had power to require wires then existing to be placed underground. Such power may have gone to the extent of requiring companies, within a reasonable time, to construct subways of their own. As a matter of course, the legislature could not compel existing companies to place their wires in the subways, and then delegate an exclusive privilege to one subway company to maintain such subways, and still compel the electric companies to place their wires in subways, if the one company to which was intrusted the power refused to give those companies room. Such a provision of law as creating a monopoly might well be criticised with reference to the object of the operation of subway companies as creators of

safety to the public, and held to be beyond the legislative power, and unconstitutional. The question, however, does not here arise as to whether the plaintiff had a right to construct subways of its own, as it had never been refused a permit to lay one.

The cases which decide that a proviso which nullifies a grant is void are those where the circumstances show the object of the grant itself to be defeated by the enforcement of the limitation. Such is not the case here. The board of electrical control, acting for the best interest of the public, and not for the purpose of bargaining and selling for profit to a corporation or individual, recognizing the public policy as adopted by the legislature, insisted upon reserving the power to prevent the stringing of the streets with dangerous wires. It declared that the permission to lay wires over and under ground was granted for future use, but that such use should not begin until its further resolution, except through the subways. The fair construction of the right given is that the plaintiff may at once lay its lines through the subway; but in pursuance of sections 4 and 5 of chapter 499 of the Laws of 1885, and sections 3 and 4 of chapter 716 of the Laws of 1887, permission may be given in the future for such partially settled places of the city and other localities as the board deems suitable for such purposes to string the overhead wires in order to maintain continuous currents until such time as the demand for service justified the placing of subways in such sections of the city. This is a construction which gives effect to the whole resolution, and is in accord with what the board should have done, and the public policy then determined. This resolution the plaintiff accepted. It is bound by the terms, and the maintenance of dangerous wires or cables in defiance of the permission granted justifies the commissioner of public works, even as an individual, to remove these wires as public nuisances. If the right of the plaintiff had depended upon some free franchise, and was not fixed and limited by the accepted terms of the privilege given by the board, the commissioner could only remove such wires as were dangerous in fact. Illuminating Co. v. Grant, 55 Hun, 232, 7 N. Y. Supp. 788. If, however, the whole system was maintained against the policy of the city, as declared by resolution of the proper board, as announced by legislative action, and as agreed to by the plaintiff itself, it was unnecessary for the commissioner to scrutinize which of the wires were dangerous, for the right to maintain the whole as against the permission given, and as likely to become dangerous, and as interfering with the operations of the fire department, never began, and the lines stood as dangerous obstructions in the streets. This court therefore holds that the commissioner of public works was justified in cutting the wires as he did, and that any inadequacy of the subways did not ripen the use by the plaintiff, which was founded upon a limited consent, into an absolute right or franchise. In coming to this conclusion I assume that the city was liable for the act of the commissioner. The city of New York is an entity operating through various departments for public service. It claims the right to remove obstructions from the streets as a

part of its municipal power. It can operate only through agents. And, justifying its right to remove these wires as obstructions, it must stand upon the position that the power sought to be justified flows from the city to the public servant, and that he acted within the scope of his official duty. See Scott v. City of New York, 27 App. Div. 240, 50 N. Y. Supp. 191.

The remaining question to be solved is that of the liability of the city for the mere value of the wire and fixtures cut and removed, on the theory of a conversion, limiting the path of justification by the boundary of necessity, which is claimed to have been simply the cutting of the wire so as to destroy the dangerous current of electricity, and drawing the lines from the street so that they would not further interfere with the street and city purposes. The appellate division in the Second department has decided upon the prior appeal that the value of the wires can be ascertained sufficiently for the purpose of estimating actual damages for the conversion of the property, imperfect as the evidence may be of what that value was, with some partial deterioration, and located as it was after the cutting, with the fixtures displaced. Its value as standing with the fixtures is unimportant except as forming a part of a continuous system of wiring wherewith to transmit the electric power from the central station for lighting and motive purposes. Its usefulness for such purpose formed an integral part of the value of the system and good will established for connected and uninterrupted business. If the city was justified up to the finishing of the cutting, the wires and fixtures became personal property, lying loosely upon the housetops, and only valuable as such at that place. If the further acts of the city formed a conversion, the damages resulting were those only arising from a conversion of personal property. I do not see how the city could rightfully claim that the loose wires and fixtures lying upon the housetops, the right to the location having been purchased by the company, became in any sense strays, or obstructions, within the meaning of the law giving the right to impound and sell at public auction as such. The city has sold these wires, and presumably received the proceeds. I do not see why it should not account for their value. They were no longer dangerous after the cutting, and those extending over the streets from house to house could easily be gathered in without further interfering with them. If thereafter they became obstructions, notice by the owners of the dwellings, or possibly by the city, might throw the burden upon the plaintiff to care for them. Such notice was not given. There is some difficulty in forming a judgment as to the value of the wires and fixtures, and the evidence is meager as to the quality, kind, value, and marketability. Considering, however, the evidence as it is, I place the value, including interest from the time of conversion, at the sum of $6,000. I do not include the wires removed by the fire department, for the evidence of the liability of the city as to those cut prior to November, 1891, is insufficient to justify the imposition of damages therefor in this action. Let judgment go against the city for $6,000 damages, besides costs, and

in favor of the other defendants against the plaintiff, dismissing the complaint, with costs.

Judgment accordingly.