BOROUGH OF WEST CALDWELL, A MUNICIPAL CORPORATION, PLAINTIFF-APPELLANT, v. BOROUGH OF CALDWELL, LIKEWISE A MUNICIPAL CORPORATION, DEFENDANT-RESPONDENT.

Argued November 18, 1957—Decided January 20, 1958.

10

*Mr. John J. McDonough* argued the cause for appellant (*Mr. William G. Wood,* on the brief; *Messrs. Darby & McDonough,* attorneys).

*Mr. Sam Weiss* argued the cause for respondent (*Mr. Julius Y. Krill,* attorney).

The opinion of the court was delivered by

HEHER, J. Our primary function here is the assessment of the content, meaning and legal efficacy of agreements made July 23, 1912 and September 13, 1955 between the plaintiff Borough of West Caldwell and the defendant Borough of Caldwell, adjoining municipalities in the County of Essex, providing for the construction by Caldwell of a sewage disposal plant within the limits of West Caldwell and the reciprocal use of the facility by West Caldwell on prescribed terms and conditions.

West Caldwell invokes the Declaratory Judgments Act, *N. J. S. 2A*:16–50 *et seq.,* for a construction of the contracts and a declaration that it may withdraw "house service * * * and lateral connections" from the Caldwell "sewer system, mains and disposal plant" at "such time or times and in such manner" as "in its best judgment shall be necessary and desirable in [its own] interest" and that of "its citizens, and as the circumstances warrant," and of the "terms and conditions, if any," of such withdrawal; and it appeals from an adverse judgment of the Law Division of the Superior Court adjudging that the "contracts" in question are "contracts in perpetuity" and their provisions are such that it "does not possess the legal right to withdraw house service connections and lateral connections from the existing Caldwell sewer system." The appeal is here by our certification, *sua sponte.*

In sum, the contention is that the "1912 agreement and the 1955 amendment constitute an option contract" and West Caldwell "has the right to withdraw from the Caldwell system," and the construction *contra* renders the "contract and the amendment *ultra vires.*"

Caldwell maintains that it would be "unreasonable and inequitable to construe either or both contracts as permitting West Caldwell to remove existing house and lateral connections from the Caldwell sewage-disposal system," or "to permit West Caldwell to erect an independent sewage system within the reasonably foreseeable future."

## I.

The agreement of July 23, 1912 recites that Caldwell "is contemplating the construction of a system of sanitary sewerage for the accommodation of [its] inhabitants * * *, and for the proper completion and operation of said system, and for the well being of the public of" Caldwell and West Caldwell, "it is considered wise and prudent to locate the disposal plant for the treatment of the sewage matter from" Caldwell "within the limits" of West Caldwell, "and to lay connecting mains from [Caldwell's] system through and under certain streets and lands in" West Caldwell, and "the inhabitants" of West Caldwell "may now or hereafter desire to avail themselves of the construction and existence of said sewer, within [its] limits, for their own use and benefit by the consent of and under regulations to be established by" Caldwell. And the writing bears witness to these promises and undertakings:

(1) West Caldwell, "in consideration of this agreement and of the benefits to be derived therefrom to [its] inhabitants, * * * has consented, and does hereby, in virtue of the powers conferred upon it in an Act of the Legislature * * * entitled 'A General Act Relating to Boroughs (Revision of 1897)' approved April 24th, 1897," as supplemented and amended, "consent that" Caldwell "may lay such pipe and mains for the conveyance and discharge of sewage matters through the territory within the limits" of West Caldwell, "and construct all such necessary manholes and basins, and building the necessary disposal plant to treat and dispose of the sewage matter thus conveyed and collected, all in accordance with the plans and specifications agreed upon and approved by the parties hereto, and accompanying this document," with full right of "ingress and egress to and along the streets and lands upon and across which the same shall be erected" for the repair and maintenance of "such pipes and structures," provided that the disposal plant to be constructed in West Caldwell shall be in accordance with "designs, principles and plans" approved

by the State Board of Health, and that the plant so erected "shall be maintained and operated under the strict supervision" of the Mayor and Council of Caldwell or its duly authorized agents "in strict accordance with all rules and requirements" of the State Board of Health; and

(2) "* * * to the end that the said sewerage system, when completed, shall be available for use by the inhabitants" of West Caldwell, "so far as reasonable and proper," Caldwell, "by virtue of the power and authority conferred" by the cited statutes, "does hereby consent and agree that" West Caldwell "may make use of the mains so constructed and to be constructed within [its own] limits, under proper rules and regulations to be adopted by" its Council, "and strictly in accordance with the terms of this agreement for the use and accommodation of as many of [its] inhabitants as may be located within the natural drainage area, so that, the use of the said sewer may be strictly by gravity discharge," provided that West Caldwell "may, if it be found necessary, install a pumping system to pump the sewage matter from houses situated on Fairfield Avenue, formerly known as Dutch Lane, South of the Simon Van Ness house, into the sewer system hereby provided for"; and

(3) since "it is the intent of this contract to provide for the accommodation of the inhabitants of both the said Boroughs," as therein "defined, * * * with proper and necessary sewage discharge," both parties agreed to "exercise all necessary and property [sic] precautions" for the "protection and safety of the said sewer and of the public during both the construction and subsequent maintenance of the said system," but Caldwell was not thereby to be relieved "from the cost of constructing and protecting and maintaining" the sewage disposal system, "also the trunk and the main sewers leading thereto, within" West Caldwell, "or from its responsibility or liability to the public for any improper method or negligence" in "constructing and maintaining the same"; and

(4) West Caldwell "shall have the right to make direct house connections with the * * * main or trunk sewer,"

and to "connect lateral sewers therewith," therein referred to as "house and lateral connections respectively," in accordance with the conditions and subject to inspection fees and service charges therein laid down, a "special rate" to be given "for all buildings not in the dwelling house class"; and

(5) in the event that West Caldwell should default in the stipulated payments "for the use of sewers," as therein provided, Caldwell was accorded the right, upon 60 days' written notice, "to shut off all connections with the * * * sewerage system," or "at its option, after said notice, in consideration of a further use of the said sewer by any householder in" West Caldwell, to "collect the proper amount due from such user, giving proper credit therefor" to West Caldwell; and there was provision for arbitration in case a dispute should arise as to "a fair charge for any special rate [therein] provided for"; and

(6) the "sewer and disposal works, exclusive of laterals and connections laid by" West Caldwell, shall be the "exclusive property" of Caldwell, and the "cost and responsibility of * * * care and maintenance" shall be borne by it; and "[a]ll laterals and connections constructed by" West Caldwell "within [its own] limits" shall be and remain its "exclusive property," and the burden of its care and maintenance shall devolve upon it; and

(7) all provisions of the "contract relating to the rates to be paid" by West Caldwell "for the use of the * * * sewer for the drainage of houses and other buildings shall be in force for a period of five years from the date when this contract takes effect," and in the event the parties were "unable to agree" on the rates for continued service, provision was made for arbitration, the rates so determined to "remain in force for a period of at least five years after they become effective," and thereafter, absent agreement, "either party may bring about a re-adjustment of rates" by the same arbitral process, "after the expiration of each five year period"; and

(8) Caldwell agreed, "in consideration of the consent for the construction of the  *  *  *  mains and sewage disposal works" therein given, "to restore all streets and roadways within" West Caldwell, "the surface of which shall be opened or disturbed" by Caldwell "in the prosecution of said work, *  *  *  as speedily as possible," to the end that traffic should not be unduly "delayed or incommoded."

Caldwell was incorporated as a borough in 1891, and West Caldwell in 1904, each thereby separating from the Township of Caldwell. The Borough of Caldwell comprises 723 acres of land, and West Caldwell covers 3,232 acres. In 1910, West Caldwell's population was 494; its land was largely used for farming; it had but "a few private residences." Caldwell's population was then 2,236; it was "primarily a residential community but also the shopping center for the surrounding countryside"; and it was found that a "sewage disposal system" was essential to its own needs. It is stipulated that "[d]ue to its limited area and high land, it was concluded to locate the plant in West Caldwell in the low Hatfield Swamp area, west of Passaic Avenue, its present location," and since West Caldwell's "consent" was "required" under *L*. 1907, *c*. 285, Caldwell initiated the "negotiations" which eventuated in the agreement of July 23, 1912.

Construction of the "Caldwell sewerage system" was begun early in 1913, and the completed structure went into operation early in 1915; thereafter, "from time to time, as the needs arose, improvements were made to the Caldwell sewerage system in 1918, 1921, 1924, 1929 and 1930."

The stipulation certifies that the "gravity area, as limited by the terms and provisions of [the] contract of 1912, constitutes approximately 30%" of West Caldwell's "land area,  *  *  *  a large part of which is presently undeveloped"; also that approximately 20% of West Caldwell's total land area "is [now] improved by the construction of homes, businesses and small industrial plants," and there "is presently a rapid growth of residential, business and light industrial development in the Borough."

It is also stipulated that "[v]ery little use was made of the rights and privileges granted to the citizens of West Caldwell to connect with the sewer until about 1920"; the "number of sewer connections from year to year subsequent to 1912 down to 1930 are not available," but "from time to time connections were made by residents of West Caldwell to the Caldwell trunk mains and trunk sewers, and from 1926 on, lateral sewer mains were constructed by West Caldwell to serve various areas in West Caldwell," the house connections running from 273 in 1930 to 1,561 in 1956.

And it is likewise agreed that West Caldwell "paid no part of the capital expense of construction of the disposal plant or mains from Caldwell to the plant"; that "sewer rentals" at the original rates were paid by West Caldwell to Caldwell "down to the year 1952 when Caldwell served official notice upon West Caldwell that it desired to renegotiate for a new rate"; that negotiations between the respective governing bodies and their engineers led to a "proposed contract" which evoked "violent [public] controversy" and its rejection by West Caldwell at a public referendum held November 2, 1954; and that later negotiations resulted in the "supplementary agreement" of September 13, 1955 between the two boroughs, pursuant to an ordinance adopted by West Caldwell, the mayor's veto notwithstanding.

This writing recites the prior agreement of July 23, 1912 and Caldwell's then present agreement to "modernize, reconstruct and enlarge its disposal plant for the purpose of increasing its capacity and among other reasons to adequately serve West Caldwell's sewage needs"; also, that "Caldwell has requested and West Caldwell has agreed that the annual rates for house connections and for all other building connections not in the dwelling house class be increased"; and that the parties "desire to modify the said Agreements herein provided and, except as herein modified, said Agreement of July 23, 1912 shall remain in full force and effect."

Caldwell thereby undertook, within the ensuing period of

two years, to "modernize, reconstruct and enlarge the sewage disposal plant to increase [its] daily capacity," according to "improvements" therein enumerated, and to "increase the capacity of its trunk line from the disposal plant to and along Passaic Avenue to a point in the vicinity of the first manhole north of the brook approximately 675 feet south of the intersection of Westville Avenue and Passaic Avenue and connect to mains as necessary."

Provision was made for "two levels for the collection system, one, the High Level, defined as the existing gravity system, and two, the Low Level, defined as the non-gravity area," and connections to the High Level district according to gravity.

And it was provided that West Caldwell "may at any time, at its own cost and expense, construct, maintain and use pumping stations to serve any small area beyond the immediate existing limits of High Level system and may connect said pumping stations to the existing High Level system by a force main and the sewage collected from said area shall be collected and pumped into the High Level system through said force main," provided the mains are of sufficient capacity to receive the "pumped sewage discharges"; that it "shall have the right," again at its own cost, "to construct and lay trunk mains for the collection and conveyance of sewage to the site of the Caldwell disposal plant from the several areas of West Caldwell to be served thereby"; and it "may, at any time," also at its own expense, "construct, maintain and use pumping stations in any area of its Borough which cannot be served by gravity mains," and use its own trunk mains for conveyance of the sewage "to the inlet at the site of the Caldwell disposal plant," or it may be "conveyed and discharged into the Caldwell trunk line about to be constructed on Passaic Avenue south of Westville Avenue or conveyed and discharged into the Caldwell trunk lines at such other point as may be mutually agreed upon"; and West Caldwell remains liable for the "cost of maintaining and protecting its own improvements."

The agreement prescribes the house-connection rates payable by West Caldwell and there is provision for "special rates" for all other connections "not included or specifically provided for," to be "fixed and agreed upon from time to time as and when the needs arise," and in case "a question shall arise" as to "a fair charge," it shall be decided by the method provided in the agreement of 1912. Here again, the rates set are made effective for "a period of at least five years," and "shall be subject to the rights of the parties under Paragraph 11 of the Agreement of 1912."

December 13, 1955, it is stipulated, "after public hearing," West Caldwell adopted an ordinance authorizing "a preliminary engineering study of proposed sewer extensions and pumping stations in [its] non-gravity area," and providing for a capital improvement fund for the purpose; and "under a later ordinance" enacted August 24, 1956, after the completion of the engineering study, "a pumping station and force main and sanitary sewer extension in the non-gravity area are presently under construction."

The agreed statement of facts declares that the "controversy" here "arose because of a strong movement on the part of West Caldwell citizens and certain officials" (a) to establish "a county or local sewerage authority * * * in the West Essex Area of the Passaic Valley"; (b) to create "a joint sewerage operation" between Caldwell and West Caldwell, "each municipality being an equal owner therein"; and (c) "[f]ailing in the above alternatives, to continue with [Caldwell] under the 1912 contracts [sic];" and that West Caldwell's annual payment to Caldwell "for sewerage service is presently in excess of $25,000."

It is said in the opinion of the Superior Court that after the making of the second agreement of September 13, 1955, Caldwell "appropriated $527,400 by a bond ordinance" for the "modernization of its sewer plant," and had then "actually constructed 1,250 feet of six inch water transmission main at a cost of $4,274 and about a half mile of 24 inch trunk sewer at a cost of $49,602.11," apparently taken from a concession made in the pretrial order; the

opinion states that the submission there was made "on brief and oral argument with a reservation that the Court, if it deemed necessary, might take testimony on any one or more of the issues involved," but "[n]o need for testimony appears."

## II.

Caldwell's thesis is that (a) "the 1912 and 1955 agreements cannot, in the light of the attendant circumstances undisputed by the parties, be reasonably and equitably construed to permit West Caldwell to withdraw any connections from the Caldwell system"; and (b) the agreements "cannot be construed reasonably and equitably as contemplating or permitting the construction by West Caldwell of a sewer system of its own, at any time in the future, so long as the Caldwell system remains adequate to serve West Caldwell's sewage needs."

We seek for the contractual undertakings of these subdivisions of local government, that is to say, the sense and meaning of the given symbols of expression assessed in relation to the fulfillment of the legislatively-delegated governmental function in the field of health and sanitation, a vital area of the police power; and, as in the case of other contracts, regard is to be had in the quest for the intention to the situation of the parties, the attendant circumstances, and the objects they are striving to attain. *Casriel v. King,* 2 *N. J.* 45 (1949).

Contracts between municipalities stand on the same footing as contracts of natural persons, and are governed by the same considerations in determining their validity and effect. *Mayor and Council of Jersey City v. Town of Harrison,* 71 *N. J. L.* 69 (*Sup. Ct.* 1904), affirmed 72 *N. J. L.* 185 (*E. & A.* 1905); *Frank v. Board of Education of Jersey City,* 90 *N. J. L.* 273 (*E. & A.* 1917); *Peejay Corporation v. City of Newark,* 136 *N. J. Eq.* 31 (*E. & A.* 1944). And the "existing statutes and rules of law are always among the [surrounding] circumstances" to be considered in the exercise of the interpretive process.

*Corbin, Contracts, sec.* 551, 803. See *Great Northern R. Co. v. Sunburst Oil & Refining Co.,* 287 *U. S.* 358, 53 *S. Ct.* 145, 77 *L. Ed.* 360 (1932), Cardozo, J.

The 1912 agreement is an avowed exercise of the power granted by *L.* 1897, *c.* 161, the old Borough Act, and its amendments and supplements, 1 *C. S.* (1910), *p.* 223 *et seq.,* and the general act of 1907 authorizing municipalities to establish and maintain sewage disposal plants, *L.* 1907, *c.* 285, largely incorporated in the Home Rule Act of 1917, *c.* 152, *Article* 21, *p.* 397, now *R. S.* 40:63–1 *et seq.,* under the chapter heading: "Sewers, Drains and Disposal Plants, Article 1, by a Single Municipality." The "joint meeting" provisions contained in *"Article* 2, by two or more municipalities jointly," *R. S.* 40:63–68, *et seq.* are not involved here. *Section* 28 of the original act, 1 *C. S.* (1910), *p.* 239, empowered the local governing body to provide by ordinance "for the maintenance of the health of the borough," and also "for the sewerage or drainage of the borough." There were provisions for financing the permissible operations, *sections* 29, 39; and *section* 80, under the heading "Sewerage and Drainage," authorized the construction of a "trunk sewer or lateral connecting sewers or a system of sewers and drains * * * in any part of the borough, * * *."

There can be no doubt that the primary purpose of the 1912 agreement was to provide a "disposal plant" in West Caldwell "for the treatment of the sewage matter from the Borough of Caldwell," linked to Caldwell's sewerage system by mains "through and under certain streets and lands in" West Caldwell. Such are the terms of the agreement itself; Caldwell was then "contemplating the construction of a system of sanitary sewerage for the accommodation of [its] inhabitants," and "for the proper completion and operation of said system, and for the well being of the public of the two Boroughs," it was "considered wise and prudent to locate the disposal plant" in West Caldwell, according to the authority given by *L.* 1907, *c.* 285.

The several municipalities of the State were thereby empowered, *L.* 1907, *p.* 707, to establish and maintain suitable

sewage disposal plants "within or without the limits of such municipality at any place within this State," provided the outside municipality had given its consent by appropriate action of its governing body and board of health, subject to review by the State Board of Health at the instance of ten citizen freeholders. The municipality was empowered to acquire and condemn lands for the purpose within and beyond its borders; and also "to contract with any other municipality for the disposal, treatment and rendition of the sewage of such other municipality" upon agreed terms and conditions, and two or more municipalities were authorized "to unite by mutual contract for the construction of one plant or disposal works for [their] joint benefit and use," and to agree upon the terms and conditions of the joint undertaking.

██ Under the 1912 agreement, West Caldwell assented to the use of lands within its borders for the construction and operation of Caldwell's sewage disposal plant; but it plainly did not promise to make use of the available sewerage facilities for the accommodation of its own inhabitants; it was given the option so to do on the stipulated terms, but acceptance of the service was in no wise obligatory; it was a continuing option based on an executed consideration, and thus the option giver's promise was irrevocable. *Martindell v. Fiduciary Council, Inc.,* 133 *N. J. Eq.* 408 (*E. & A.* 1943). And Caldwell did not promise to enlarge its plant to meet West Caldwell's future needs; indeed, there was not a certain and definite promise to supply all of West Caldwell's immediate needs; quite the contrary.

██ The tokens of intention are to have a reasonable interpretation, taken and compared together in the context of the circumstances. A contract is an agreement resulting in obligation enforceable at law. It is basic to an agreement entailing obligatory jural consequences that the parties have a distinct intention common to both; "doubt or difference" is incompatible with agreement. To be enforceable as a contractual undertaking, an agreement must be sufficiently definite in its terms that the performance to be

rendered by each party can be ascertained with reasonable certainty. *Friedman v. Tappan Development Corporation,* 22 *N. J.* 523 (1956). The writing is to have a reasonable interpretation. Disproportionate emphasis upon a word or clause or a single provision does not serve the object of interpretation. The general purpose of the agreement is to be considered in ascertaining the sense of particular terms. The literal sense of particular words or clauses may be qualified by the context and given the meaning that comports with the probable intention. It is the revealed intention that is to be effectuated, the sense that would be given the integration by a reasonably intelligent person. *Mantell v. International Plastic Harmonica Corporation,* 141 *N. J. Eq.* 379 (*E. & A.* 1947).

Here, Caldwell had undertaken the construction of a sewerage system "for the accommodation" of its own inhabitants; it had found that a "sewage disposal system" was required to serve its own essential needs; its own area was limited, the elevation high, and its population was then much greater than West Caldwell's; and for the "proper completion and operation" of the system and the "well being of the public" of both municipalities, it was deemed "wise and prudent" to place the proposed disposal plant in West Caldwell; the sewerage system thus provided would be made "available for use by the inhabitants" of West Caldwell "located within the natural drainage area, so that the use of the sewer may be strictly by gravity discharge," supplemented by West Caldwell's use of its own pumping system to serve houses on a given street, if it chose to exercise the right. But there was no obligation laid upon West Caldwell to make use of the facility. West Caldwell made no contribution to the capital outlay attending the construction of the disposal plant or the connecting mains laid within its borders; and it was under no duty so to do. The sewer system and the disposal plant remained the "exclusive property" of Caldwell; only the "laterals and connections constructed" by West Caldwell were to be its own.

Thus, the agreement constituted an option contract, that is to say, a continuing offer supported by a sufficient consideration, a promise upon an executed legal consideration, and so irrevocable for the time of its continuance. Though irrevocable, the contractual option is but an offer; and notice of its unqualified acceptance, *e. g.,* where the subject matter concerns the sale of goods or personal property, ordinarily serves to create a bilateral executory contract of sale, as in the case of the conventional offer of sale and its unconditional acceptance. *Friedman v. Tappan Development Corporation, supra; Corbin, Contracts, section* 263. Acceptance by performance rather than an executory promise to perform may give rise to a unilateral contract. By the acceptance of an option such as we have here, a promise founded on an executed consideration, the unilateral option contract becomes a bilateral executory contract, to the extent of the requested performance. *Martindell v. Fiduciary Council, Inc., supra.*

Such is the spirit and indubitable reason of the written memorial of the bargain. West Caldwell made little or no use of the option until 1920; and thereafter, as performance of the promise was requested from time to time, the option-giver was required to render and the option-holder to pay for the stipulated sewer service. And, meanwhile, West Caldwell's requirements in this regard increased in keeping with its substantial growth and development from year to year.

The 1955 agreement had a different setting ; the rise in the population of both municipalities during the intervening years had enhanced the need for sewer service; and the terms of this agreement are to be assayed accordingly. The acknowledged design was to "modernize, reconstruct and enlarge" Caldwell's "sewage disposal plant" and thus to increase its "daily capacity," and to increase the capacity of the trunk line from the disposal plant to and along Passaic Avenue, all to be done by Caldwell within two years at its own cost; there would be no contribution by West Caldwell to the capital improvement; the disposal plant

and sewerage facilities would remain Caldwell's own exclusive property. And, as just said, Caldwell did not promise to supply West Caldwell's need in full; there is no such undertaking in terms, nor is it fairly impliable.

Provision was made for two levels "for the collection system," gravity and non-gravity; and West Caldwell was given leave, at its own expense, to construct and use pumping stations for specified areas and to lay connecting mains, provided the sewage discharges did not exceed the capacity of the receiving mains, and to utilize such in areas which could not be served by gravity mains. And there was agreement upon a rate increase. But, save as therein modified, the 1912 agreement remained in full force and effect. It was still an option contract; West Caldwell did not bind itself to make further connections with Caldwell's sewerage system; there was no indication of an intention to alter the contractual relation of the parties in this behalf.

And the exercise of the option from time to time did not lay upon West Caldwell a contractual duty to pay in perpetuity the stipulated rentals and service charges, or as modified in the mode and manner provided by the writing. The bilateral contract of service that thereby came into being did not expressly delimit the time of its duration. But on well settled principles the agreement is not for that reason illusory, as too uncertain and indefinite for enforcement. The term of service may well be fixed by implication. Here, West Caldwell had rendered an executed consideration for the option, and to hold that the agreement is terminable at will would plainly subvert the evident reason and spirit of the contractual arrangement. The much more probable hypothesis is that the parties had in view continued performance for a reasonable time; and implications from the special circumstances and the relations of the parties are frequently read into the integration to serve the reasonably apparent design and to avoid injustice so obvious as to exclude it as an element of conscious intention. Compare *Green v. Obergfell, 73 App. D. C. 298, 121 F. 2d 46, 138 A. L. R. 258 (D. C. App. Ct.* 1941),

*certiorari* denied 314 *U. S.* 637, 62 *S. Ct.* 72, 86 *L. Ed.* 511 (1941).

In an action for determination, by a declaratory judgment, of the period of duration of an employer's contract with an insurer for the issuance of annuity policies to his employees, the judgment was that the employer held a continuing option to purchase annuities for its new employees at the price set by the contract, which, absent a provision fixing a "term for the option," was terminable, not at will by the insurer, but "after a reasonable time." *Freeport Sulphur Co. v. Aetna Life Insurance Co.,* 206 *F. 2d* 5, 41 *A. L. R. 2d* 762 (5 *Cir.* 1953). There, the district judge held that 25 years was a "reasonable time" for the operation of the contract; the Circuit Court of Appeals reduced the period to 20 years, pointing out that there had been radical changes in economic conditions, a sharp decline in interest rates, and life expectancy had substantially lengthened, all factors entering into the calculation of the premium rates, which were made subject to modification by the insurer under a specific reservation in the contract.

The process of reasonable implication is but one of inferable intention; and what is reasonable is ordinarily a subject on which opinions will differ, and so it is a question of fact. What constitutes a "reasonable time" is usually an implication of fact, and not of law, derivable from the language used by the parties considered in the context of the subject matter and the attendant circumstances, in aid of the apparent intention. *Edge v. Boardwalk Securities Corporation,* 115 *N. J. L.* 286 (*E. & A.* 1935). The court will "infer that the parties have agreed upon performance within a reasonable time." *Corbin, Contracts, sections* 19, 96, 554.

The true contract and the *quasi*-contract are thus distinguished. A contract implied in fact "is one sort of an express contract"; a *quasi*-contractual obligation is created by the law, "for reasons of justice," "without regard to expressions of assent by either words or acts"; the "legal relations between contractors are dependent upon the inter-

pretation of their expressions of assent; in *quasi*-contract the relations of the parties are not dependent on such interpretation," although, observes Professor Corbin, "considerations of equity and morality play a large part in the process of finding a promise by inference of fact as well as in constructing a *quasi*-contract without any such inference at all." *Corbin, Contracts, sections* 19, 102. And see *Parev Products Co., Inc., v. I. Rokeach & Sons, 124 F. 2d* 147 (2 *Cir.* 1941); also *Corbin, "Quasi-Contractual Obligations," 21 Yale L. J.* 533 (1912). The true implied contract consists of an obligation "arising from mutual agreement and intent to promise but where the agreement and promise have not been expressed in words," a contract implied in fact. *Williston on Contracts* (3d *ed.,* by Professor Jaeger), *section* 3. The constructive or *quasi*-contract is the formula by which enforcement is had of a public duty raised to prevent unjust enrichment or unconscionable benefit or advantage, just as the constructive trust serves the same end in equity. *Williston, Ibid., section* 3A.

Perpetual contractual performance is not favored in the law; and a construction affirming a right in perpetuity is to be avoided unless given in clear and peremptory terms. *Freeport Sulphur Co., v. Aetna Life Insurance Co., supra.* See *Corbin, Contracts, section* 96. It is not often that a promise "will properly be interpreted as calling for perpetual performance"; only in such "negative promises as to forbear suit or not to carry on a business or occupation is so broad an interpretation likely to be permissible"; more commonly "the true interpretation will mean some period short of infinity"; and "partly in order to carry out the supposed actual intention of the parties and partly, doubtless, in order to prevent an offer or agreement from being ineffectual because too indefinite, courts will, where the contract contemplates a single act or exchange of acts, unless the circumstances show a contrary intention, interpret a promise which does not in terms state the time of performance as intending performance in a reasonable time"; a promise to forbear suit is interpreted, in the absence of

circumstances showing that perpetual forbearance or forbearance for some other time was intended, "as calling for forbearance for a reasonable time"; "not infrequently promises requiring continuing performance (other than contracts of service) have been interpreted as requiring performance for a reasonable time, or until terminated by a reasonable notice"; "[a]ll the circumstances of each case must be considered in reaching a conclusion," and "[e]specially if consideration for such a promise is partly executed a court will be reluctant to hold that the promise is determinable at the promisor's pleasure." *Williston, Contracts, Ibid., section* 38.

This is not, as we have seen, a "joint meeting" of the municipalities for the common construction, maintenance and operation of a system of sewerage, trunk sewers and disposal works, within or without the municipalities, or any of them, in which the municipal participants would have an equal voice in the discharge of this governmental responsibility, as provided for in *R. S.* 40:63–69 *et seq.,* or a joint operation under *R. S.* 40:63–68(*a*), but rather a contract by which Caldwell provides sewerage facilities for West Caldwell under the prescribed terms and conditions without a specific limitation as to time or term, a contract that had its inception in Caldwell's need, for physical reasons, to place its disposal plant within the confines of West Caldwell, apparently in the exercise of the power granted by *R. S.* 40:63–68(*b*) and (*c*).

The health of the people is a primary concern of the social order, the first principle of all civil government. The safeguarding of the public health is thus an essential governmental function within the police power of the State, *Valley Farms Company of Yonkers v. Westchester County,* 261 *U. S.* 155, 43 *S. Ct.* 261, 67 *L. Ed.* 585 (1923); *Lake Shore & M. S. R. Co. v. Clough,* 242 *U. S.* 375, 37 *S. Ct.* 144, 61 *L. Ed.* 374 (1917); and it is axiomatic that the State's delegation to the municipalities and other agencies for local governmental administration of the power and responsibility of providing sewerage and sanitation facilities to this end

cannot be abdicated or renounced or surrendered to another such agency without legislative permission. The Legislature is the exclusive source of the municipality's authority, both in its governmental and corporate or proprietary character; and the power is to be exercised as given. *City of Jersey City v. Martin,* 126 *N. J. L.* 353 (*E. & A.* 1941); *Van Cleve v. Passaic Valley Sewerage Commissioners,* 71 *N. J. L.* 183 (*Sup. Ct.* 1904); *Jersey City Supply Co. v. Jersey City,* 71 *N. J. L.* 631 (*E. & A.* 1905). As said in an early case, the issue here concerns "the disposal of one of the most dangerous forms of sewage," the "right of the public to protect itself from nuisances, and to preserve the general health." *Commonwealth v. Roberts,* 155 *Mass.* 281, 29 *N. E.* 522, 16 *L. R. A.* 400 (*Sup. Jud. Ct.* 1892).

The corollary theorem is that a municipality cannot bind itself by a perpetual contract, or a contract of unreasonable duration, unless by legislative sanction. Compare *Westminster Water Co. v. Westminster,* 98 *Md.* 551, 56 *A.* 990, 64 *L. R. A.* 630 (*Ct. App.* 1904). And this is *a fortiori* true where, as here, the subject matter of the contract bears on the legislative or governmental function of the local subdivisions of government, involving as it does the exercise of the police power in the vital area of health and sanitation in fulfillment of the public need attendant on growth in population and new and different land uses and the expansion of old uses. *R. S.* 40:63–68(*b*) and (*c*) have no such quality or scope; these provisions plainly do not contemplate the surrender or abridgement of the local police power by such measures in perpetuity or for an unreasonable period of time. It is to be presumed that the Legislature intended not to subvert, but to maintain the local police power in all its vigor to serve public necessity, comfort and convenience as it arises, and meantime to invoke such measures as would be ample under the then existing conditions. We have here two contiguous local subdivisions of the State Government acting in the common interest under a grant of power by the Legislature for the general public good and welfare; and the contractual undertaking is to

be assessed accordingly. We are concerned here with a basically continuing governmental power that is not exhausted by its exercise at a given time.

Governmental power to regulate and control the use of highways in the public interest cannot be surrendered or impaired by contract. *Missouri, K. & T. R. Co. v. Oklahoma,* 271 *U. S.* 303, 46 *S. Ct.* 517, 70 *L. Ed.* 957 (1926); *American Rapid Telegraph Co. v. Hess,* 125 *N. Y.* 641, 26 *N. E.* 919, 13 *L. R. A.* 454 (*Ct. App.* 1891); *Vandalia R. Co. v. State,* 166 *Ind.* 219, 76 *N. E.* 980 (*Sup. Ct.* 1906). So also, in the field of public health and sanitation.

And the construction and other costs incurred by Caldwell in reliance upon the 1955 agreement, if such was indeed the case, may well be an element to be considered with all the facts and circumstances in resolving the factual issue of reasonable time for the continuance of the agreement as so modified.

Reversed and remanded for judgment accordingly.

*For reversal and remandment*—Chief Justice WEINTRAUB, and Justices HEHER, WACHENFELD, BURLING, JACOBS, FRANCIS and PROCTOR—7.

*For affirmance*—None.