LARIO, J.T.C.
Taxpayers, husband and wife, have filed an appeal challenging the Director’s imposition of a $797.58 assessment plus interest and a penalty of $39.98 as the balance due on their 1978 return filed pursuant to the New Jersey Gross Income Tax Act, N.J.S.A. 54A:1-1 et seq. (the act). Plaintiffs claim, additionally, that they are entitled to a refund of $331. Both the Director’s assessment and plaintiffs’ refund claim are based only upon the husband’s reported income and expenses; the wife is a party solely by reason of their having filed a joint return.
For the tax year 1978 plaintiffs’ reported gross earnings were $54,103. Plaintiff-husband claims the right, as permitted by N.J.S.A. 54A:5-1(b), to set-off from his gross earnings, expenses in the sum of $32,373 on the basis that his income consisted of net profits from a business; whereas the Director has determined his income to be “commissions ... for services rendered” under the provisions of N.J.S.A. 54A:5-1(a).
*122 The parties have stipulated that the issue is whether the husband (hereinafter plaintiff) was engaged in an independent 'business as he claims, or was an employee as concluded by the Director. They have further stipulated that if it is determined that the Director’s position is correct, the full amount of $797.58 plus interest and penalty is due from plaintiff; but if plaintiff’s status is that of an independent contractor, plaintiff is entitled to a refund of $331 plus interest.
In support of his claim, plaintiff testified as follows: Sometime in 1978 he read a newspaper advertisement placed by a company seeking individuals interested in running their own business. In response thereto he met with a representative of the Safety-Kleen company (hereinafter S-K), which resulted in his entering into an oral agreement with the company. S-K is a corporation located in Elgin, Illinois, whose business consists mainly in leasing and servicing cleaning equipment to various businesses, primarily gas stations. The equipment is utilized by the lessees to wash, clean and remove grease from property including tools and equipment owned by the lessees. The corporation also has about 13 allied products, such as hand soap and garage floor soap, which it sells to the lessees. Plaintiff stated that as a result of his meeting with S-K’s representative they orally agreed that S-K would supply plaintiff with a motor vehicle and lease a warehouse building from which plaintiff would operate. Furthermore, S-K would provide him with an inventory of its allied sale products, as well as the cleaning products, he was to use in servicing the corporation’s lease equipment. Preliminarily, plaintiff was required to establish that he had a cash reserve of $10,000. He eventually met this condition by securing that amount from his father-in-law. At the time the oral agreement was entered into, he was advised that a written agreement would be executed by the parties; however, this agreement was not received by him until eight months after he began working. S-K had leased a warehouse located in West Chester, Pennsylvania, wherein four van-type trucks each having a built-on box in the rear were garaged. The vehicles, which were leased by the corporation from a *123 second company (which plaintiff believed was a subsidiary of S-K) were placed under the control of the plaintiff, under what plaintiff termed a “lease agreement,” whereby certain operating and maintenance costs were chargeable to plaintiff. Additionally there was located in the warehouse, an inventory supplied by the corporation which consisted of cleaning equipment and parts together with the allied sale products. This inventory had a total worth of approximately $35,000. Plaintiff did not put up any cash for these items, but instead signed a receipt for them. At the time he signed for the inventory it was his understanding that every three months he had to account to the corporation for the inventory; that is, what items were sold and paid for and what items remained on hand. At that time he would also order, on consignment, replacement parts and products. If there were any difference between the amount of items sold and paid for and his inventory balance, plaintiff was held accountable and was required to pay for them, this sum being deducted from his commission.
When he started, plaintiff was supplied with a list of approximately 1,000 customers whom he was to contact for the purpose of servicing their equipment. At that time, although he had four trucks, one of which he was to operate, he had no other drivers, therefore, it was necessary for him to hire three salesmen-drivers. Plaintiff was authorized to hire as many salesmen-drivers as he deemed necessary. He had sole responsibility for hiring, dismissing and disciplining all personnel under his jurisdiction. Furthermore, it was his responsibility to train and supervise these driver-salesmen. Consequently, plaintiff advertised for and hired three persons. He divided his area into territories which he assigned to drivers whose main job was to service the parts-washer equipment and to supply the cleaning chemicals to customers. This service was a regular monthly service whereby a salesman automatically visited a customer’s place of business and simply changed the chemical in the equipment whether it was clean or dirty. Additionally, a salesman would solicit and write-up orders for the purchase of any products that the corporation had for sale. A salesman would return *124 to the warehouse and give the purchase orders to plaintiff who, in turn, would supply the products to the salesman for delivery to the customer. When payment was eventually received plaintiff would deposit the receipts in a bank account.
Within a period of less than eight months plaintiff’s customers had increased from approximately 1,000 to 4,500 and he had hired a total of six salesmen-drivers. He eventually received permission to move the operation to a warehouse site closer to his residence in Vincentown, New Jersey. Plaintiff testified that by the time he terminated his agreement, which existed approximately four and one-half years, he had a total of ten salesmen-drivers.
After he moved the warehouse to New Jersey, plaintiff opened an account in a local bank. This account was titled in the name of S-K and all deposits from customers, sales and services were credited to it. When he made his deposits to the account the bank would automatically transfer the money from this account to an account of S-K located in Elgin, Illinois.
The written agreement, which designated plaintiff as “branch manager,” stipulated that S-K could not terminate their relationship except for proper cause. It provided that plaintiff must devote at least 40 hours a week to the business; however, plaintiff was not paid an hourly rate but instead received compensation strictly on a commission basis determined by the sales and services produced by his operation.
He was entitled to receive as compensation “adjusted branch commissions” which the written contract stated was an amount which is equal to “gross branch commissions” less “sales representative compensation.” “Gross branch commissions” was defined in the agreement as all commissions earned without limitation and “sales representative compensation” as the total of the sales representative’s salary plus commissions. The contract further specified that the salesman’s basic salary, which is not deducted or paid from his commissions, is $180 a week, $90 of which S-K “subsidized.” Plaintiff was given the right to voluntarily increase a salesman’s salary but the increase was to *125 be paid from gross branch commissions. Plaintiff testified that after receiving permission from S-K, he subsequently increased the salaries to $200 a week for several salesmen and to $400 a week for four salesmen. S-K contributed a total of only 50% or $150 of the salary, whichever sum was less; the balance was paid from plaintiff’s gross commissions.
Salaries plus commissions due salesmen were paid to them directly by S-K who made all the usual salary deductions and filed all necessary employer returns, such as social security, unemployment and withholding income taxes. S-K also made these deductions for plaintiff but as to what extent and how wages were calculated was not made clear. Plaintiff carried no workers’ compensation insurance for himself or his employees and whether it was carried by S-K was not demonstrated.
Plaintiff was required to keep daily records of the names and addresses of all customers serviced, the services performed and what products, if any, were sold. This information had to be forwarded daily to the main office. When received, the main office would put this information into a computer whereby it was determined how much money was owed to plaintiff and his salesmen respectively.
Plaintiff was allotted $.75 for each service of a parts-washer from which sum his salesmen-drivers were credited with $.60 and plaintiff was credited with the balance of $.15 which was his compensation for gas and other operating expenses. Everytime a product was sold he was credited with 10% of the purchase price which was allocated 7% to a driver and 3% to plaintiff. If plaintiff sold the product directly, he received the full 10%.
From the inception of his operation with S-K, plaintiff advanced all the money expended for gasoline, maintenance and repairs for the operation of the trucks. For the first 30 days of the operation he received no money whatsoever from S-K.
The agreement specifies that S-K will lease from a leasing company the truck-vans to be used by plaintiff who, in turn, will be obligated to pay the pick-up and delivery charges for the vans and, upon termination of their relationship, to return the *126 vehicles. Plaintiff was required to pay all costs of operating and maintaining the vans which “costs include, without limitation, monthly rentals due to the leasing company, costs of normal repairs, operation and maintenance, licenses, fuel, oil, registration fees and cost of repairs due to collision damage up to the amount of $250 for each occurrence.” Upon return of the vehicles, at the termination of their relationship, any cost and expense incurred by S-K to make repairs or refurbishing as determined by S-K was to be charged to plaintiff and deducted from any balance due him.
After 30 days he received his first compensation check which was termed a “branch operating allowance check.” Although plaintiff was not entitled to either a salary or an advancement, he later worked out an arrangement whereby it was agreed that he would receive $300 every two weeks charged as a draw against his potential earnings.
As part of the agreement plaintiff was required to operate “within the limits of the established corporate policies and procedures.” However, he claimed that he had never received any documents stating what these policies and procedures were, with the exception of a one page letter which set forth the standards of S-K requiring in effect that he was “not to tarnish their name in any way or anything like that.”
As plaintiff’s business increased, he hired additional salesmen and leased more vans. The procedure was to notify S-K who ordered the van and notified plaintiff when the van was ready to be picked up in Elgin, Illinois. Plaintiff would then fly to Elgin, pick up the van and drive it back to Vincentown. Plaintiff followed this procedure on six occasions, each time at his own expense without reimbursement.
During the four and one-half years of their agreement plaintiff had to borrow $25,000 which was used to compensate for various costs and expenses incurred in this operation. When he terminated his relationship' he was personally indebted to a finance company for $15,000 of which S-K was not liable for *127 any part. Moreover, S-K claimed that plaintiff was indebted to it for approximately $11,000 in inventory shortages.
N.J.S.A. 54A:2-1 imposes a tax on all New Jersey gross income which is defined in N.J.S.A. 54A:5-1 to consist of 14 enumerated categories, which in pertinent part includes:
(a) Salaries, wages, tips, fees, commissions, bonuses and other remuneration received for services rendered whether in cash or in property;
(b) Net profits from business. The net income from the operation of a business, profession, or other activity, after provisions for all costs and expenses incurred in the conduct thereof, determined either on a cash or accrual basis in accordance with the method of accounting allowed for federal income tax purposes but without deduction of taxes based on income.
Defendant claims that plaintiff was an employee of S-K and thus his income consisted of “commissions ... for services rendered” as enumerated in subsection (a) undiminished by any expenses incurred in connection therewith. Plaintiff claims his income was from the operation of a business which entitles him to deductions as permitted by subsection (b).
“[C]ommissions ... and other remuneration received for services rendered ...” as used in subsection (a) and “the net income from the operation of a business, ... or other activity, ...” as used in subsection (b) are not defined in the act. The only appellate case dealing with these sections of the act is Domenick v. Taxation Div. Director, 176 N.J.Super. 121, 422 A.2d 443 (App.Div.1980) wherein plaintiff challenged the Director’s refusal to permit him to deduct expenses not reimbursed by his employer, complaining that it was unconstitutional for the Director to differentiate between employed salesmen, such as himself, and self-employed salesmen, who were permitted deductions. The court concluded that a rational basis existed for the differentiation thereby upholding the act’s constitutionality. There plaintiff did not claim to be engaged in an independent business. He stipulated that he was an employee, thus making it unnecessary for the court to define either “employed-taxpayer” and “commissions” or “self-employed taxpayer” and a “business ... or other activity.” Nor was the court required to decide whether a finding that a taxpayer was an employee *128 precluded him from claiming that he also had income from a business which would permit business deductions.
Since the Domenick decision, the issue presented sub judice was the question presented in three recent cases decided by collateral parts of this court. Boudrot v. Taxation Div. Director, 4 N.J.Tax 268 (Tax Ct.1982); Landwehr v. Taxation Div. Director, 6 N.J.Tax 66 (Tax Ct.1983), and Poppe v. Taxation Div. Director, 6 N.J.Tax 108 (Tax Ct.1983). All three decisions uniformly ruled that the determination of whether a taxpayer’s status is that of an employee or an independent contractor is a factual question to be decided only after examining all of the relevant facts and circumstances with no single factor being controlling; it being the total situation that finally determines the status. Boudrot v. Taxation Div. Director, supra at 274; Landwehr v. Taxation Div. Director, supra at 70; Poppe v. Taxation Div. Director, supra at 114.
In Boudrot Judge Crabtree examined several federal cases on this issue and abstracted therefrom eight relevant factors which are among those normally weighed to decide whether the relationship created was one of employer-employee or independent contractor. These factors are:
(1) the relationship which the parties believe they have created; (2) the extent of control exercisable (regardless of actual exercise) by the person receiving the benefit of the services over the manner and method of performance; (3) whether the person rendering the service undertook substantial costs to perform the services; (4) whether the service required special training of skill; (5) the duration of the relationship between the parties; (6) whether the person rendering the service had a risk of loss; (7) whether the person who received the benefit of the services could discharge without cause the person who performed the services and (8) the method of payment (by time or job), [at 274]
These factors were also among those considered by Judge Rimm in Landwehr at 70, and Judge Andrew in Poppe, at 114.
In all of these cases each judge carefully analyzed and weighed all of the facts and circumstances of each taxpayer’s relationship, powers and duties in arriving at his conclusion. In Boudrot and Landwehr it was determined that the respective taxpayer’s income was from the operation of a business; where *129 as, in Poppe it was found that his income was commissions from his employment. Therefore, to ascertain plaintiffs status it is incumbent to scrutinize the rights and obligations of both S-K and plaintiff and weigh the total situation.
Those factors indicative of an employer-employee relationship are as follows:
The written agreement is entitled “employment agreement” and it names plaintiff as “employee.” It refers to him throughout as employee and designates his title as branch manager. S-K designated its payments as commissions and it withheld state and federal income taxes therefrom together with unemployment and disability deductions. S-K supplied plaintiff with a W-2 form. On plaintiffs 1978 federal income tax return, he listed himself as a branch manager.
The agreement provided that plaintiff must operate within the limits of established corporate policies and procedures or as directed by his regional manager to whom he was accountable. He was required to devote not less than 40 hours a week to his duties.
The contract provided a formula intended as a reimbursement to plaintiff for his truck lease payments as well as for maintenance and operation expenses incurred. Plaintiff used S-K trucks and materials exclusively and the bank account was in the sole name and control of S-K.
Plaintiff could be discharged only for good cause. Their relationship was terminated unilaterally by plaintiff after four and one-half years, during which time he worked for no one else.
Those facts and circumstances which indicate that plaintiffs income was from the operation of a business are as follows:
Plaintiff claims that when he first responded to the advertisement he was being offered an opportunity to engage in a business. He was requested to have in advance a $10,000 cash reserve and no specific experience was necessary.
After the agreement was entered into, plaintiff was given the authority to hire, discipline and fire driver-salesmen. He was *130 required to train them as well as to schedule, assign and supervise their duties. He was required to contribute a minimum of 50% of their salaries and supply them with delivery trucks. The trucks were leased and the cost thereof was charged to him. Moreover, he was required to pay all costs and expenses for their delivery, operation and maintenance. Conditioned upon plaintiff’s strict compliance with the agreement, S-K agreed to credit plaintiff with an amount equal to the investment tax credit to which S-K was entitled upon acquisition of a new vehicle. S-K’s products were forwarded to plaintiff under consignment and he was responsible for all shortages. He did not receive a minimum salary nor a paid vacation.
The court must scrutinize those clauses which indicate an employer-employee relationship together with those which manifest an independent business enterprise, then weigh them as a totality to ascertain the true status created. After analyzing plaintiff’s testimony together with the written agreement and other exhibits submitted, I find that, although plaintiff may have been an employee for other purposes not presently in issue before me, a majority of the qualitative factors involved lead me to conclude that, in reality, plaintiff’s income was derived from the operation of a business.
The strongest factor in favor of defendant’s interpretation of the relationship created is the “employment agreement.” However, the court cannot blindly accept its terminology without examining its overall intent and its ultimate effect. It is a well established principle of law that, in construing a contract, words and phrases are not to be isolated, but related to the context and the contractual scheme as a whole, giving the meaning that comports with probable intent and purpose. West Caldwell v. Caldwell, 26 N.J. 9, 25, 138 A.2d 402 (1958); Union County U-Drive It v. Blomely, 48 N.J.Super. 252, 256, 137 A.2d 428 (App.Div.1958). Thus, in interpreting this contract the court cannot be limited by the use of certain “terms” and “phrases.” The court must interpret these terms and phrases in light of the *131 overall context and scheme of the contract. The use of terms “employee” and “employment agreement” have significance only to the extent that they comply with the overall contractual scheme.
Since the words “business” and “other activity” are not defined in N.J.S.A. 54A:1-1 et seq., in the absence of an express contrary indication, words and phrases used by the Legislature must “be given their generally accepted meaning, according to the approved usage of the language.” N.J.S.A. 1:1-1. Black’s Law Dictionary (5 ed. 1979) 179 defines business as “[ejmployment, occupation, profession or commercial activity engaged in for gain or livelihood ... [enterprise in which person engaged shows willingness to invest time and capital on future outcome. Doggett v. Burnett [Burnet] 62 App.D.C. 103, 65 F.2d 191, 194.” In Walsh v. Taxation Div. Director, 183 N.J.Super. 370, 4 N.J.Tax 107, 443 A.2d 1128 (Tax Ct.1982), Judge Rimm stated, quoting from Morgan v. Commonwealth, 42 Pa.Commw. 557,400 A.2d 1384 (Commw.Ct.1979): “In the court’s view the term ‘commercial enterprise’ entails ‘the rendering of goods or services to others’ ....” 183 N.J.Super. 370, 4 N.J.Tax. at 113, 443 A.2d 1128.
I accept and find as fact plaintiff’s testimony that when he was first interviewed by S-K’s agent, it was represented that he was being offered an opportunity to engage in a business. This conclusion is supported by plaintiff’s being required to have a $10,000 cash reserve and to advance all operating expenses for the first 30 days of operation before he received any “commissions.” A prospective employee certainly would not be expected to meet these financial prerequisites.
The most prominent features of other terms in the agreement which demonstrates the creation of an independent business are located in the clauses dealing with compensation for plaintiff and the driver-salesmen. Under those clauses plaintiff is not entitled to draw a salary but instead receives, as consideration, an amount which is equal to “gross branch commissions” less “sales representative compensation” based upon a formula calcu *132 lated on sales and services by him and the driver-salesmen. This feature alone is not an unusual commission-payment arrangement. It is contrary, however, to all concepts of an employer-employee relationship for an employee to be responsible for any part, let alone more than 50%, of an alleged co-employee’s salary. Here plaintiff contributed 50% of the base salary of six drivers who were paid $200 a week and $250 of a $400 base weekly salary paid to four drivers — a total weekly contribution of $1,000 toward a $1,850 payroll.
It is also contrary to an employer-employee status to require an employee to travel, on six occasions, at his own expense from New Jersey to Illinois to pick up trucks to be operated by “co-employees,” drive them back to New Jersey, also at his own expense, and to pay for their annual registration and licensing.
Another strong factor in the contract indicating an independent business is the clause requiring plaintiff to pay the initial $250 cost of collision damage to any of the trucks. This liability was not predicated upon plaintiff’s negligence. It was plaintiff’s absolute responsibility even when caused by the negligence or vandalism of the driver or third parties. Plaintiff testified that, although S-K paid insurance premiums for the trucks, he was charged for these payments. It is obvious that S-K secured $250 deductible collision insurance and the premium was included in the lease payment. S-K had no risk of loss without payment for the coverage. Also S-K’s granting the benefit of investment tax credits to plaintiff is consistent with truck ownership by him.
Another strong indicium of the operation of a business was the manner in which inventory was treated. Under their agreement S-K consigned certain products to plaintiff, holding him responsible for their safety and accountable for any “loss, damage or expense of the company in connection [therewith],” without regard to the cause therefor. The contract required an inventory to be taken every three months and any deficiencies were to be reimbursed by plaintiff. The contract further stated plaintiff “agrees that the company shall have the unconditional *133 right to reduce any payment otherwise due branch manager by an amount sufficient to reimburse the Company for any shortage.” Emphasis supplied. The requirements established thereby are not characteristic of an employment status. It is a rare occasion that goods are consigned to employees, and furthermore, it is contrary to New Jersey law for an employer to withhold or divert a portion of an employee’s wages, unless expressly provided for by statute. N.J.S.A. 34:11-1.4. Additionally, absent a showing of negligence or conversion, an employee is not responsible for an employer’s loss. In Male v. Acme Markets, Inc., 110 N.J.Super. 9, 264 A.2d 245 (App.Div. 1970) it was noted that withholding costs of shortages from wages “was deemed to be in violation of N.J.S.A. 34:11 — 4.4, which prohibits employers from ‘withholding’ or ‘diverting’ from wages payable any sums other than those specifically authorized by that statute.” At 10, 264 A.2d 245. The court interpreted the statute to also preclude the employer from requiring reimbursement on some day subsequent to pay day. Id. at 10-11, 264 A.2d 245.
If the agreement is deemed to be an employment contract, the above clause which grants the employer an “unconditional” right to reduce payments regardless of the cause of the shortage violates N.J.S.A. 34:11-4.4. However, if the agreement is viewed as a franchise-type agreement this clause would not be violative of the statute. The court, in this situation, will adopt the construction which will render the clause legal rather than the one rendering it illegal. Kelly v. Guarantee Trust Co., 114 N.J.Eq. 110, 168 A. 413 (N.J.1933).
While it is true that the contract expressly delineates certain duties to plaintiff, a closer reading of these in conjunction with the overall intent of the agreement results in a finding that such provisions are merely guidelines. S-K exercised no control over plaintiff’s day to day operations. Plaintiff had broad discretion in implementing these guidelines. His basic responsibilities were to maintain customer satisfaction, preserve the “good name” of S-K and make a profit. These were mainly *134 general guidelines and plaintiff was required to implement them by his own chosen methods. As noted in Boudrot, “[i]f an individual is subject to the control or direction of another merely as to the result to be achieved, and not as to the means of accomplishing it, the individual is an independent contractor. Jones v. Goodson, 121 F.2d 176, 179 (10 Cir.1941).” Boudrot v. Taxation Div. Director, supra at 275.
In analyzing and weighing the duties as set forth in the “agreement,” the court must delve into the intracacies of the contractual provisions. As noted by the Caldwell court in construing a contract the court must give the meaning that comports with probable intent and purpose. There is no question but that during the four and one-half years of its existence plaintiff believed he was operating a business. It is inconceivable that he would have secured a $10,000 loan for an initial reserve; paid for the rental of trucks and their operating costs, paid substantial portions of salaries and invested upwards of $25,000 of his personal money into the operation without such a belief. The fact that plaintiff deposited receipts daily to S-K’s bank account does not reverse this conclusion. Since S-K forwarded its materials on consignment and no money was paid by plaintiff in advance, this banking arrangement was S-K’s method of protecting its investment.
I find that the operation created by S-K was in the nature of the franchise business. Plaintiff did not receive the written agreement until months after he had begun operating. An examination of the exhibit reveals that it is a pre-printed form agreement with only two items typed in: plaintiff’s name and address and his assigned territory. I am satisfied that all of the terms and conditions of the contract were dictated by S-K, who unilaterally.chose and inserted all of its terminology, and that plaintiff had no input whatsoever. S-K devised its agreement to permit plaintiff to operate a business but it skillfully framed the terms thereof in order to control its franchise and to protect its receipts for leasing equipment and inventory consigned to plaintiff without bearing any risk of loss. Plaintiff, in *135 effect, had the benefit of “leasing” a franchise business without the necessity of paying an initial purchase price which gave him the opportunity of operating what might have become a lucrative and profitable business.
Therefore, although for some purposes which are not presently before this court S-K may be deemed an employer, I conclude that plaintiff was engaged in the operation of a “business ... or other activity” as contemplated by N.J.S.A. 54A:5-1(b) and, as such, he was entitled to deduct all costs and expenses actually incurred in the conduct thereof.
I further find that even if it were determined that plaintiff was not engaged in a business activity a large portion of the claimed deductions would nevertheless be proper. Of the $32,373 claimed, $26,075 represented expenses incurred for truck leases ($9,704), truck maintenance ($14,641), and service center maintenance ($1,730).
The written agreement specifically includes a “truck cost allowance” clause which provides that “as a means of reimbursing [plaintiff] the expense incurred by him in operating, maintaining and repairing the vehicles ... S-K agrees to make periodic payments to [plaintiff] of certain sums (allowances) to be computed and paid or credited to him according to the following terms:” Immediately following are set forth formulae for a “base truck cost allowance” and for a “gasoline allowance.”
Defendant in its posttrial brief admitted that
Plaintiff, however, did benefit from an expense reimbursement formula set forth in his employment contract. In that contract Safety-Kleen did not undertake to reimburse plaintiff for each and every separate expense item he incurred. Rather, plaintiff and Safety-Kleen agreed on a formula which theoretically would make plaintiff whole if he operated his business efficiently and honestly. The formula used could have resulted in excess payments to plaintiff. In fact, it did not. [Citations omitted]
In Domenick Judge Michels stated:
[T]he Director has construed subsection (a) as not to require an employee to include in gross income amounts received from his employer in reimbursement of expenses incurred on the employer’s behalf, provided such employee incurred *136 actual expenses in that amount. Thus, Domenick is not required to include in gross income the $200 monthly partial reimbursement for expenses paid by his employer under the agreement, provided, of course, that he incurred actual expenses in that amount. [176 N.J.Super. at 128, 422 A.2d 443]
Plaintiffs reported on their federal return a gross income of $54,103 of which $46,566.65 was itemized on the W-2 income tax form supplied by S-K as “12. wages and other compensation.”[1] Also listed thereon was “17. truck $21,143.77.” This latter item was neither explained nor commented upon at trial or in any brief. Copies of S-K’s employer returns for F.I.C.A. and Pennsylvania’s Bureau of Employment Security, which were placed in evidence, establish that S-K reported to both the Internal Revenue Service and the Pennsylvania Department of Labor that the total wages paid to plaintiff in 1978 was $25,422.88. Subtracting this amount from the $46,566.15 compensation reported on the W-2 form computes to $21,143.77 which is identical to the amount in # 17 therein labeled “truck.”
I find that the sum of $21,143.77 was a partial reimbursement by S-K to plaintiff for truck expenses and that plaintiff actually incurred truck expenses in at least that amount. Therefore, even if defendant’s theory, that plaintiff’s income represents employee commissions, were accepted as correct, under the Director’s construction of subsection (a) as reported in Domenick, the reimbursed truck expenses are not to be included in plaintiff’s gross income thereby reducing it to $25,422.88. However, by reason of the conclusion, heretofore set forth, that plaintiff is entitled to deduct expenses as permitted by subsection (b), it is not necessary to recalculate plaintiff’s gross income under the Director’s construction of subsection (a).
Judgment will be entered setting aside the Director’s assessment and directing a $331 refund to plaintiff.

 A copy of plaintiffs’ joint federal return lists their joint gross income as $54,103. However, only the husband’s W-2 form was placed in evidence. Presumably the difference of $7,536.35 represents earnings of the wife whose occupation is listed thereon as “bank teller.”